IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 104,520

STATE OF KANSAS,
*Appellee*,

v.

SCOTT P. ROEDER,
*Appellant*.

SYLLABUS BY THE COURT

1.

A defendant requesting a change of venue based upon pretrial publicity must satisfy the district court that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial in that county. The defendant bears the burden to show prejudice exists in the community as a matter of demonstrable reality and to show that the level of prejudice makes it reasonably certain that the defendant cannot obtain a fair trial.

2.

Both our federal and state constitutions entitle a criminal defendant to present evidence in support of his or her theory of defense, but a trial court does not err by excluding evidence that is not relevant to a legally sufficient theory of defense.

3.

Regardless of whether Kansas courts can recognize a necessity defense as a matter of common law and regardless of the formulation of the defense that might be adopted, the necessity defense would never be available to a defendant who commits premeditated first-degree murder of a doctor in order to prevent that doctor from performing an

1

abortion sometime in the future, even if the defendant is convinced that the doctor will fail to comply with all the administrative rules and regulations applicable to abortion providers.

4.

The crime of imperfect defense-of-others voluntary manslaughter is defined as the intentional killing of a human being committed upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211. Under K.S.A. 21-3211, a person is justified in the use of deadly force against another's use of unlawful force when the person reasonably believes deadly force is necessary to prevent the imminent death or great bodily harm to a third person.

5.

An unreasonable but honest belief that circumstances existed that justified deadly force will not support a claim of imperfect defense-of-others unless the circumstances, if reasonably believed, would have supported a claim of perfect defense-of-others under K.S.A. 21-3211.

6.

If, as a matter of law, the circumstances that the defendant honestly believed existed would not have supported a claim of imperfect defense-of-others, the trial court does not err in refusing to admit the defendant's proffered evidence to corroborate the honesty of the defendant's belief.

7.

A prosecutor's improper comment or argument during closing argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of

rebutting defense counsel's arguments. The extemporaneous, rebuttal nature of a prosecutor's comment or argument is merely a factor that may be considered on appeal.

8.

Where there is no reasonable possibility that a prosecutor's improper comment or argument during closing argument contributed to the jury's verdict, the error will not result in a reversal of the defendant's conviction.

9.

Where the defendant testified that he intentionally killed a specific person after having premeditated the murder for approximately 16 years, any error by the district court in refusing to give a lesser included offense instruction on second-degree murder based upon the killing being an instantaneous act was harmless beyond a reasonable doubt.

10.

A perfect defense-of-others claim is not objectively reasonable where the perceived harm to be prevented will not occur until sometime in the future, *i.e.*, where the other's unlawful use of force against a third person is not imminent.

11.

The test for cumulative error is whether the trial errors, which were not singularly reversible, nevertheless combined in such a way as to deny the defendant his or her right to a fair trial.

12.

Kansas' statutory procedure for imposing a hard 50 sentence as provided in K.S.A. 21-4635 violates the Sixth Amendment to the United States Constitution as interpreted in

*Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2155, 2160-63, 186 L. Ed. 2d 314 (2013), because it permits a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence, rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt.

13.

The propriety of retroactively applying the hard 50 sentencing scheme set forth in K.S.A. 2013 Supp. 21-6620 after an appellate court vacates a hard 50 sentence imposed pursuant to K.S.A. 21-4635 will not be ripe for appellate review until a prosecutor chooses to pursue such a sentence upon remand for resentencing.

Appeal from Sedgwick District Court; WARREN M. WILBERT, judge. Opinion filed October 24, 2014. Convictions affirmed, hard 50 sentence vacated, and case remanded with directions.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, argued the cause, and *Michelle A. Davis*, of the same office, was with her on the briefs for appellant, and *Scott P. Roeder*, appellant pro se, was on the supplemental briefs.

*Boyd K. Isherwood*, chief appellate attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

*Stephen Douglas Bonney*, of ACLU of Kansas & Western Missouri, of Kansas City, Missouri, and *Alexa Kolbi-Molinas* and *Talcott Camp*, of counsel, ACLU Foundation, of New York, New York, were on the brief for amici curiae National Abortion Federation, American Civil Liberties Union, and ACLU of Kansas & Western Missouri.

4

The opinion of the court was delivered by

JOHNSON, J.: On May 31, 2009, Scott Roeder executed his years-old plan to kill Dr. George Tiller to prevent the Wichita, Kansas, doctor from performing any further abortions. After fatally shooting the doctor from point blank range during church services while the doctor served as an usher, Roeder hastily fled the premises. During his getaway, Roeder threatened to shoot two other ushers who had pursued him outside the church. Roeder did not deny committing the physical acts underlying a premeditated first-degree murder charge and two counts of aggravated assault, and the jury convicted him of those offenses.

On appeal, Roeder challenges both his convictions and his hard 50 life sentence. With respect to his convictions, Roeder raised numerous issues, some of which overlap, to-wit: (1) The district court erroneously denied his requested instruction on voluntary manslaughter based upon an imperfect defense-of-others; (2) the district court violated his due process right to present a defense of voluntary manslaughter based upon an imperfect defense of another; (3) the district court erroneously denied the defense motion for a change of venue; (4) the prosecutor committed reversible misconduct during closing argument; (5) the district court violated his due process right by excluding evidence to support a necessity defense and by failing to instruct on the necessity defense; (6) the district court erroneously denied his requested second-degree murder instruction; (7) the district court erroneously denied his requested defense-of-others instruction; and (8) the cumulative effect of trial errors denied him a fair trial. Finding that Roeder was not denied a fair trial, we affirm his convictions.

With respect to Roeder's sentence, our determination that the sentencing scheme in K.S.A. 21-4635 violates the Sixth Amendment to the United States Constitution requires

5

that we vacate Roeder's hard 50 sentence and remand for resentencing. Therefore, we will not address Roeder's other sentencing issues.

FACTUAL AND PROCEDURAL BACKGROUND

Because Roeder did not deny that he intentionally shot Dr. Tiller in the head with the premeditated intent to kill him or that he intentionally threatened to shoot the two ushers to prevent their pursuit as he ran away from the church, a good deal of the evidence at trial dealt with Roeder's religious beliefs and their manifestation into his perceived need to kill Dr. Tiller.

Roeder testified about his 1992 conversion to Christianity, which ultimately led to a strong opposition to abortion. He testified that he believed that "[f]rom conception forward, [abortion] is murder" because "[i]t is not man's job to take life." As his feelings against abortion intensified, Roeder became actively involved in the anti-abortion movement, often demonstrating at abortion clinics, including Dr. Tiller's, in an attempt to convince patients not to have abortions. Roeder focused on Dr. Tiller because the doctor "was one of the three late-term abortionists in the country," and Roeder believed late-term abortions "are definitely wrong." Roeder encouraged women arriving at Dr. Tiller's clinic to instead seek counseling next door at the Crisis Pregnancy Center. Roeder related that some of the women with whom he spoke outside Dr. Tiller's clinic ultimately decided not to have abortions, and he therefore deemed his interventions to be successes in his fight against abortion.

Roeder was also allowed to testify about the criminal charges that had been brought against Dr. Tiller and Roeder's frustration with the results of those cases. He related that in 2006, the Attorney General at that time filed felony charges in Sedgwick County alleging that Dr. Tiller had unlawfully performed late-term abortions but that

6

those charges were dismissed the next day at the insistence of the Sedgwick County District Attorney. In 2009, an assistant attorney general prosecuted Dr. Tiller on 19 misdemeanor counts of failing to follow the correct procedure in performing late-term abortions, but a jury acquitted Dr. Tiller on all 19 counts. Roeder testified that the acquittal caused him to believe that

> "[t]here was nothing being done and the legal process had been exhausted and these babies were dying every day, and I felt that if someone did not do something, he was going to continue aborting children, and so I felt that I needed to act and quickly for those children."

Roeder was further permitted to discuss previous attempts to "stop" Dr. Tiller by other anti-abortion criminals. For instance, Dr. Tiller's clinic was bombed in 1986, but the clinic was functioning again a few days later. In 1993, a woman shot Dr. Tiller once in each arm, but he was back at work the next day. Accordingly, in 1993, Roeder began exploring the possibility of personally using physical force against abortion providers in general and Dr. Tiller in particular. Roeder even admitted that he initially thought about cutting Dr. Tiller's hands off with a sword but ultimately decided that he needed to kill Dr. Tiller.

Roeder explained that he abandoned his initial plans to commit the murder at Dr. Tiller's home or clinic because of the security measures the doctor had put in place. That circumstance led Roeder to the realization that the only place he could get close enough to Dr. Tiller was in the doctor's church. From the record, one cannot discern whether Roeder grasped the irony of his testimony, *i.e.*, the only way that Roeder could kill the doctor in the name of his own God was to commit the murder in the house of Dr. Tiller's God. Roeder took affirmative steps toward accomplishing the goal of his new plan as

early as 2002 when he made his first visit to the doctor's church and gathered information about the premises.

Some years later, in 2008, Roeder again attended the services at Dr. Tiller's church, this time armed with a 9mm weapon with which to shoot the doctor. That attempt was thwarted by the doctor's absence from that particular service.

On May 18, 2009, Roeder bought a Taurus PT .22 caliber semi-automatic handgun from a pawn shop in Lawrence, Kansas. Roeder's federal background check was held up, delaying delivery of the weapon to Roeder until May 23, 2009. The next day, Roeder took that weapon to Dr. Tiller's church, but again, the doctor was not attending the service. Six days later, Roeder returned to the pawn shop to buy two boxes of ammunition, which he took to his brother's home in a rural area near Topeka, Kansas, to test fire his gun. After experiencing problems with the weapon, Roeder and his brother went to a gun shop in Topeka and purchased a different type of ammunition before Roeder headed to Wichita to "deal with Dr. Tiller." During his drive to Wichita, Roeder pulled over in rural areas and test-fired the weapon with the new ammunition.

After arriving in Wichita, Roeder attended the Saturday evening service, but again, the doctor was not in attendance. After staying the night in a Wichita hotel, Roeder returned to Dr. Tiller's church. He backed his car into a stall as close as possible to the church doors to facilitate a hasty exit. Roeder entered the church and took a seat in the sanctuary until he spotted Dr. Tiller in the church foyer. Then, he approached the doctor and, without warning, placed the gun to Dr. Tiller's forehead and pulled the trigger. Roeder immediately fled the scene of the crime, running from the church foyer to his parking spot and then driving away in his vehicle.

Two men who were serving as ushers with Dr. Tiller that Sunday, Gary Hoepner and Keith Martin, separately chased after Roeder. At different points along his escape route, Roeder separately pointed his weapon at Hoepner and Martin, threatening to shoot each of them. Hoepner was able to report the shooting to a 911 operator, and another church member relayed Roeder's vehicle license plate number.

After leaving the church parking lot, Roeder drove towards his Kansas City home. Along the way, he disposed of his weapon in Burlington, Kansas. A deputy spotted Roeder's vehicle on I-35 and pulled him over near Gardner, Kansas, at approximately 1:25 p.m. Roeder made no attempt to resist arrest.

Roeder testified that he killed Dr. Tiller because if someone did not stop Dr. Tiller, "he was going to continue [performing abortions] as he had done for 36 years." More specifically, Roeder believed that if he did not kill Dr. Tiller, unborn children were going to die 22 hours later because Dr. Tiller had abortions scheduled at his clinic the next day.

The jury convicted Roeder of premeditated first-degree murder and two counts of aggravated assault. The district court found aggravating circumstances to impose a hard 50 life sentence on Roeder's first-degree murder conviction, as will be discussed below, and further imposed 12 months' imprisonment on each of the aggravated assault convictions; all sentences were imposed consecutively.

Roeder timely appeals his convictions and hard 50 sentence. We take the liberty of addressing Roeder's issues in a different order than he presented them, beginning with his change of venue request, the disposition of which could render the remaining issues on appeal moot.

9

Prior to trial, Roeder's counsel filed a motion for change of venue based on the long history of public conflict and controversy surrounding the abortion portion of Dr. Tiller's medical practice and, more particularly, based on the publicity surrounding this homicide case. At the motion hearing, defense counsel proffered into evidence 32 exhibits which detailed the reporting of the case by The Wichita Eagle, the community's major daily newspaper. Defense counsel "stipulate[d] that part of the pretrial publicity [was Roeder's] own doing" but argued that fact did not change the district court's inquiry into whether pretrial publicity had tainted the jury pool. The defense asked the judge to either rule that the pretrial publicity, standing alone, mandated moving the trial to a new venue or to keep an open mind throughout jury selection because defense counsel, if necessary, planned to make a renewed motion after attempting to impanel a jury.

The district court initially held that it would be premature to rule on a change of venue until the court had attempted to impanel a jury. Jury selection began with 140 venire persons, who had all completed a questionnaire prepared by the district court to be utilized during jury selection. The court split the potential jurors into three panels, and the parties conducted an individual voir dire of the first panel of 61 persons. Jury selection proceeded smoothly, and the district court was able to impanel a jury that it declared to be fair and impartial without going beyond the first panel of potential jurors. The district court then denied Roeder's renewed motion for a change of venue. On appeal, Roeder contends that the district court abused its discretion in refusing to change venue because the prior history of turmoil surrounding the abortion clinic in Wichita, coupled with the pretrial publicity in this case, resulted in the Wichita community being prejudiced against Roeder. We disagree.

10

*Standard of Review*

Roeder's appellate counsel acknowledges that, pursuant to *State v. Higgenbotham*, 271 Kan. 582, 591, 23 P.3d 874 (2001), this issue would be reviewed for an abuse of discretion and that the defendant would carry the burden to show prejudice. Recently, in *State v. Carr*, 300 Kan. ___, 331 P.3d 544, 596 (2014), we clarified that a change of venue challenge under the Sixth Amendment to the United States Constitution based on pretrial publicity is viewed through two different lenses:

> "'The first context occurs where the pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community. We "presume prejudice" before trial in those cases, and a venue change is necessary.' [*Goss v. Nelson*,] 439 F.3d [621,] 628 [10th Cir. 2006]. 'In such cases, a trial court is permitted to transfer venue without conducting voir dire of prospective jurors.' *House v. Hatch*, 527 F.3d 1010, 1023-24 (10th Cir. 2008).
>
> "The second context, 'actual prejudice,' occurs 'where the effect of pretrial publicity manifested at jury selection is so substantial as to taint the entire jury pool.' *Goss*, 439 F.3d at 628; see *Gardner v. Galetka*, 568 F.3d 862, 888 (10th Cir. 2009). 'In cases of actual prejudice, "the voir dire testimony and the record of publicity [must] reveal the kind of wave of public passion that would have made a fair trial unlikely by the jury that was impaneled as a whole." [Citation omitted.]' *Hatch*, 527 F.3d at 1024."

A presumed prejudice challenge is subject to a mixed standard of review. The court first looks for substantial competent evidence in the record to support the factors that must be considered to determine presumed prejudice. See *Carr*, 300 Kan. at ___, 331 P.3d at 599-603 (discussing *Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 [2010] factors). But the overall weighing of the *Skilling* factors results in a conclusion of law that is subject to a de novo standard. *Carr*, 300 Kan. at ___, 331 P.3d at 599. On the other hand, the actual prejudice analysis is reviewed for an abuse of discretion. 300 Kan. at ___, 331 P.3d at 605.

11

*Analysis*

The Kansas statute governing a change of venue calls for the defendant to establish a high level of prejudice, to-wit:

> "In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him [or her] to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he [or she] cannot obtain a fair and impartial trial in that county." K.S.A. 22-2616(1).

Our caselaw confirms that a defendant seeking reversal of a denied motion to change venue is facing a steeply uphill battle. "The determination of whether to change venue is entrusted to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. *State v. Cravatt*, 267 Kan. 314, 336, 979 P.2d 679 (1999)." *Higgenbotham*, 271 Kan. at 591. The defendant bears the burden "to show prejudice exists in the community, not as a matter of speculation but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial. 267 Kan. at 336." 271 Kan. at 591-92.

Roeder does not make a constitutional presumed prejudice challenge. His brief quotes *Higgenbotham* for the factors to consider when determining whether the statutory grounds for a change of venue exist:

> "In determining whether the atmosphere is such that a defendant's right to a fair trial would be jeopardized, courts have looked at such factors as the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated to other areas to which venue could be

12

changed; the length of time which elapsed from the dissemination of the publicity to the date of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn." 271 Kan. at 592.

Roeder does not segregate the factors for individual consideration, rather he focuses on the general facts that Dr. Tiller was at the center of a decades-long conflict with anti-abortionists and that there was "'massive pretrial publicity'" about Dr. Tiller's death. Certainly, there is plenty of evidence in the record from which one could find that the particular degree to which the publicity circulated throughout the Wichita community was much greater than for most other homicides. For instance, the day after Dr. Tiller's death, June 1, 2009, The Wichita Eagle printed seven articles—three on the paper's front page—which contained multiple statements from anti-abortion and abortion rights groups, together with an opinion piece and letters to the editor relating to Dr. Tiller and the homicide investigation. Several articles identified Roeder as the suspect in Dr. Tiller's murder, including a front page article headlined: "Suspect is linked to anti-government group," which included Roeder's photograph and information on his past anti-abortion activities. The Wichita Eagle continued to carry articles related to Dr. Tiller and/or the homicide investigation each day through June 10, 2009, and, thereafter, the paper ran relevant articles on the following dates in 2009: June 13, 14, 17, 19, 20, 21; July 26, 29; August 10, 30, 31; October 23, 25, 30; November 10, 11, 13, 14, and 24. Letters to the editor and opinions regarding Dr. Tiller's death were also prevalent. Several of the articles contained information the media received from Roeder and his counsel. For example, one article discussed Roeder's interview with The Kansas City Star where Roeder admitted killing Dr. Tiller and discussed his trial strategy.

But Roeder has not met his burden by simply establishing the existence of a large amount of pretrial publicity. This court has opined that "media publicity alone *never* establishes prejudice." (Emphasis added.) *State v. Verge*, 272 Kan. 501, 508, 34 P.3d 449 (2001); see also *Higgenbotham*, 271 Kan. at 593 (quoting *State v. Ruebke*, 240 Kan. 493, 500, 731 P.2d 842, *cert. denied* 483 U.S. 1024 [1987]; "'[m]edia publicity alone has never established prejudice per se'"). Moreover, although we are not aware of any precedent that would preclude a defendant from intentionally creating the publicity upon which the defendant later relies to establish the requisite prejudice to support a change of venue, such a ploy should be unavailing.

Notwithstanding the notion of gamesmanship, one can imagine that there is a sound basis for refraining from exclusive reliance on the degree to which publicity circulated throughout the community when considering whether to change the venue of a trial. For one thing, there must be some place to which the trial could be moved that would not be subject to the same degree of prejudice as the original community. Thus, the second factor addresses the degree to which the publicity or that of a like nature has circulated to those other areas to which venue could be changed.

Roeder did not present evidence on this factor, in stark contrast to the defendant in *Higgenbotham*, who presented a survey conducted by a litigation consulting firm. The *Higgenbotham* survey revealed that a high percentage of the people residing in Harvey County, the trial community, believed that the defendant was guilty. In comparison, the survey revealed that the residents of Ellis County, with a similar makeup as Harvey County, did not suffer "the same problems with regard to publicity and knowledge of the case." *Higgenbotham*, 271 Kan. at 593. In contrast to that comparative information, Roeder's own pretrial motion alleged that Dr. Tiller was known on a national scale and that the national media "including network television, national daily publications, and major internet news sources ran stories detailing the events of the killing with utmost

14

priority." That argument actually counseled against changing venue because a move to another Kansas judicial district would still leave the trial susceptible to the prejudice created by such pervasive national publicity.

The factor addressing the amount of time that elapsed between the most intense publicity and the date of trial does not appear to be particularly compelling for either side. The majority of the coverage about which Roeder complains, especially the coverage not spurred by Roeder himself, occurred months before the trial. Some prospective jurors noted during individual voir dire that they had heard about the case when it first happened but that they had thereafter not followed or heard much about the case. Others mentioned that a lot of time had passed between the crime and the voir dire.

With respect to the next *Higgenbotham* factor, the record reveals that the district court exercised a great deal of care in selecting the jury. On January 6, 2010, approximately 140 jurors were summoned to court to complete the questionnaire. On January 11, 2010, at the request of the State and defense, the district court issued an order closing jury voir dire "to insure the defendant a fair and impartial jury to decide this trial." Further, based on the answers given by the potential jurors in the questionnaires, the court granted the State and defense's request for "individual voir dire of each juror to explore any challenges for cause, outside of the presence of [the] entire venire, so that any individual answers [would not] taint the entire panel." As previously noted, the court impaneled a jury from the first group of 61 persons.

Not surprisingly, given the amount of initial publicity, all of the selected jurors had experienced some degree of media exposure about the case prior to trial. But as Roeder acknowledges, all of the selected jurors indicated that they could be fair and impartial and base their decision on the evidence presented in court, rather than what they had previously heard or read. Moreover, the history of abortion as a hot button issue in

15

Wichita, together with the pretrial publicity, cut both ways. A number of potential jurors participating in the individual voir dire had negative things to say about Dr. Tiller, suggesting that in some instances the publicity was detrimental to the State, rather than the defense.

The juror challenges exercised by the defense, both peremptory and for cause, do not suggest that the defense was saddled with an unduly prejudiced venire. The defense challenged nine jurors for cause, and the trial court only overruled three of those challenges, none of whom sat on the jury. The defense had a total of 14 peremptory challenges to exercise. Five of the prospective jurors passed for cause did not need to be considered to obtain the 14 persons needed, with two alternates.

Roeder does argue that the next factor—the connection of government officials with the release of publicity—cut in his favor because the district attorney was "widely quoted" in the media as claiming that Dr. Tiller's death was "'an American act of terrorism.'" But that quote was not given directly to the media by the district attorney. Rather, the comment was made in a telephone conversation with the district court concerning Roeder's bond which was released to the media. Further, the quote only appeared in the newspaper one time. Moreover, the label of "terrorism" has commonly been attached to facts which replicate those that Roeder proudly admitted, *i.e.*, the cold-blooded murder of an unarmed and defenseless person in a place of worship for the sole reason that the victim refused to abandon his or her own beliefs in favor of those of the killer and to thereby send a message to all who might similarly sin in the future.

The factor of the severity of the charged offense—premeditated first-degree murder—favors Roeder, albeit he was not charged with capital murder. Countering that factor is the size of the area from which the venire is drawn. Sedgwick County is a large metropolitan area, which would diffuse the effects of the publicity.

Reviewing all of the factors articulated in *Higgenbotham*, taken together, we cannot discern that the district court abused its discretion in denying Roeder's motion for a change of venue. Perhaps most importantly, here, like in *Higgenbotham*, "there was no undue difficult[y] in [i]mpaneling a jury," 271 Kan. at 594, and, therefore, Roeder's substantial rights were not prejudiced.

NECESSITY DEFENSE

Next, we consider Roeder's challenge to the district court's ruling that he could not present a necessity defense and, correspondingly, that he could not have the jury instructed on that defense. Prior to voir dire and apparently in response to Roeder's lengthy pro se brief in support of a necessity defense, the State sought a ruling that Kansas does not acknowledge the necessity defense. Relying on *City of Wichita v. Tilson*, 253 Kan. 285, 855 P.2d 911 (1993), and a Florida case, the State argued that "abortion is not a harm that can be used to invoke the necessity defense." The district court ruled in favor of the State. Roeder contends on appeal that the disallowance of his necessity defense violated his due process right to present evidence in support of his theory of defense.

*Standard of Review*

The issues of whether the necessity defense is recognized by Kansas law and whether the defense was applicable to Roeder's criminal acts are questions of law subject to unlimited appellate review. See 253 Kan. at 288.

17

*Analysis*

Roeder points out that this court has recognized that both our state and federal constitutions entitle a criminal defendant to present the theory of his or her defense. See *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). But it is not error for the trial court to exclude evidence that is not relevant to a legally sufficient theory of defense. *Cf. State v. Pennington*, 281 Kan. 426, Syl. ¶ 2, 132 P.3d 902 (2006) (no error to exclude psychologist's expert testimony proffered in furtherance of theory of defense when evidence irrelevant to *mens rea* defense). For instance, a defendant is not constitutionally entitled to present evidence that he or she did not know that his or her actions were unlawful because ignorance of the law is not a legally sufficient theory of defense. See *State v. Young*, 228 Kan. 355, 360, 614 P.2d 441 (1980) (all persons presumed to know general public laws of state where they reside, as well as legal effects of their actions). Accordingly, Roeder's constitutional challenge hinges upon whether necessity can be a legally recognized theory of defense under the facts of his case.

Roeder acknowledges this court's rejection of the necessity defense in *Tilson*. There, the district court had acquitted Tilson despite her admission that she violated the City of Wichita's criminal trespass law by blocking the entrance to an abortion clinic. The lower court ruled that the necessity defense absolved Tilson of criminal responsibility because the expressed purpose of her actions was to prevent the evils she perceived to be associated with an abortion. Initially discussing the background of the necessity defense, *Tilson* explained:

> "Necessity is a common-law defense recognized in some jurisdictions, while in others it has been adopted by statute. Several states which have no statute on the defense have not determined whether the common-law defense will be recognized. It has been referred to by various terms, including 'justification,' 'choice of evils,' or 'competing harms.'

18

Depending upon the jurisdiction, various elements must be proven in order for a defendant to establish the defense." 253 Kan. at 288.

The *Tilson* court then opined that "[r]egardless of what name is attached to the defense . . . one thing is clear:  The harm or evil which a defendant, who asserts the necessity defense, seeks to prevent must be a legal harm or evil as opposed to a moral or ethical belief of the individual defendant." 253 Kan. at 289-90. In that vein, the court noted that "[e]very appellate court to date which has considered the issue has held that abortion clinic protesters, or 'rescuers' as they prefer to be called, are precluded, as a matter of law, from raising a necessity defense when charged with trespass. [Citations omitted.]" 253 Kan. at 292. The rationale utilized by "[t]he majority of courts. . . [was] that because abortion is a lawful, constitutionally protected act, it is not a legally recognized harm which can justify illegal conduct." 253 Kan. at 293; see also *Hill v. State*, 688 So. 2d 901, 906 (Fla. 1996) (rejecting the necessity defense to charges of first-degree murder for killing an abortion clinic physician and a volunteer and stating that harm component of its inquiry cannot be met by legal abortions as a matter of law), *cert. denied* 522 U.S. 907 (1997). Moreover, the *Tilson* court concurred with cases cited from other states that held:

"To allow the personal, ethical, moral, or religious beliefs of a person, no matter how sincere or well-intended, as a justification for criminal activity aimed at preventing a law-abiding citizen from exercising her legal and constitutional rights would not only lead to chaos but would be tantamount to sanctioning anarchy." 253 Kan. at 296.

But *Tilson* was careful to note that "the necessity defense, except as codified in statutes such as those relating to self-defense and compulsion, has not been adopted or recognized in Kansas." 253 Kan. at 291. *Tilson* did not resolve that question of whether the necessity defense could ever be used in another circumstance. Instead, the court simply chose to hold that, even if necessity can be a legally sufficient theory of defense in

this state under some scenarios, it would not apply to trespass prosecutions involving abortion clinics. 253 Kan. at 296; see also *State v. Hunt*, No. 106,296, 2012 WL 3966535, at *3 (Kan. App. 2012) (unpublished opinion), *rev. denied* 297 Kan. 1251 (2013) (refusing to find that common-law defense of necessity was abolished by statute, but finding necessity defense not applicable to facts of that case).

More recently, our Court of Appeals had occasion to consider whether the necessity defense could be utilized to defend against a trespass charge when the defendant claimed that *illegal* abortions were being performed on the premises. *City of Wichita v. Holick*, No. 95,340, 2007 WL 518988 (Kan. App. 2007) (unpublished opinion). In that case, the defendant was convicted of trespass in violation of the Wichita City Code for protesting at Dr. Tiller's clinic despite the defendant's assertion of the necessity defense based upon his allegations that the clinic was performing illegal abortions "on minors, coerced women, and women with viable late-term pregnancies." 2007 WL 518988, at *3.

The *Holick* panel held that, to invoke the necessity defense, Holick had to show an imminent harm or evil which he sought to prevent by his actions and that "'under Kansas law the harm must be something more than the performance of an abortion.'" 2007 WL 518988, at *3. The panel was unconvinced by Holick's allegations that the "something more" was present in his case because *unlawful* abortions were occurring at the clinic. First, the panel found that Holick had failed to establish that partial birth abortions were scheduled on the day of the protest, "let alone that such procedures were planned without compliance with the requirements of K.S.A. 65-6721(a)(1) and (a)(2)." 2007 WL 518988, at *4. Perhaps more importantly, the Court of Appeals found that Holick's principal purpose in trespassing was to prevent *all* abortions, not just illegal abortions. 2007 WL 518988, at *5.

En route to its decision, the *Holick* panel noted that the district court had utilized the Tenth Circuit Court of Appeals' formulation of the necessity defense, which requires a defendant to show "(1) that the defendant was faced with a choice of evils and chose the lesser evil, (2) the defendant acted to prevent imminent harm, (3) the defendant reasonably anticipated a direct causal relationship between his conduct and the harm to be averted, and (4) the defendant had no legal alternatives to violating the law." *Holick*, 2007 WL 518988, at *3 (citing *United States v. Turner*, 44 F.3d 900, 902 [10th Cir. 1995]). Roeder used that formulation in his requested jury instruction on the necessity defense, the refusal of which he now appeals. Even under Roeder's own proffered elements of necessity, the defense was simply not applicable to the facts of this case.

Before considering whether Roeder chose the lesser of two evils, we must clarify the evils subject to comparison. On one side of the ledger, Roeder's admitted evil act was the premeditated intentional murder of a human being who was legally recognized as a person in all respects. Arguably, only capital murder would be a greater legal harm.

On Roeder's side of the ledger, the evil he sought to prevent was Dr. Tiller's failure to comply with all of the rules and regulations applicable to abortion providers, *i.e.*, administrative or procedural irregularities. Roeder wants to argue that the doctor was murdering babies, but that is his religious and moral view, rather than the legal view in this state. As noted above, *Tilson* declared that "[t]he harm or evil which a defendant, who asserts the necessity defense, seeks to prevent must be a legal harm or evil as opposed to a moral or ethical belief of the individual defendant." 253 Kan. at 289-90. Indeed, one need look no further than Dr. Tiller's criminal trial upon which Roeder relies to establish his belief that illegal abortions were occurring at the clinic. The doctor was not charged with murder, but rather that trial was about misdemeanor violations for failing to follow the proper procedure.

Once the choice of evils is clarified to be the premeditated intentional murder of a human being versus the violation of administrative procedures governing an otherwise legal abortion, the answer is crystal clear. By analogy, no one would find it necessary to kill an over-the-road trucker for failing to maintain an up-to-date log book. Roeder cannot clear the first hurdle of the necessity defense because he did not choose the lesser evil when he killed Dr. Tiller in cold blood.

Likewise, Roeder fails the second test, *i.e.*, that he acted to prevent *imminent* harm. Roeder acknowledges that Dr. Tiller was not going to cause the harm of which he complains until the next day. Obviously, there were not going to be any abortions performed at the church while the doctor was ushering for a Sunday morning service. Roeder argues that the potential that the doctor would perform an abortion some 22 hours after the shooting qualified as imminent harm. We disagree. The shooting occurred at the church because it made the assassination easier to accomplish, not because the perceived harm was imminent. Moreover, Roeder testified that he first determined that it would be necessary to kill Dr. Tiller in about 1993, that he formulated the plan to kill the doctor at his church in 2002, and that he attended the doctor's church in 2008 with the intent to kill the doctor before he actually effected his plan in May 2009. That timeline belies the notion that Roeder sincerely believed that the harm to be prevented was imminent; one does not wait over a decade to prevent an imminent harm.

The causal relationship requirement was arguably met because Roeder's killing of the doctor would avert the perceived harm that the doctor would fail to follow proper administrative protocol in performing abortions. But the final requirement for necessity—that the defendant had no legal alternatives to violating the law—is belied by Roeder's own testimony. He boasted of being successful in getting potential patients to change their minds about having an abortion. Moreover, *Holick* referred to additional legal means of educating women on abortion, including door-to-door discussions, distributing

literature on abortion, or continuing lawful protests. 2007 WL 518988, at *7 (quoting *Turner*, 44 F.3d at 902). Even for Roeder's professed purpose of stopping *all* abortions, not just illegal abortions, the Draconian measure of murder was not the only alternative.

As in *Tilson*, we decline to definitively state whether the necessity defense has any life in this state under other circumstances. We do hold, however, that the facts of this case unequivocally preclude the application of the necessity defense, and the district court did not err in refusing to allow Roeder to rely on that defense or to instruct the jury on the necessity defense.

## VOLUNTARY MANSLAUGHTER—IMPERFECT DEFENSE-OF-OTHERS

Next, we consider Roeder's argument that the district court erred in denying his requested lesser included offense instruction on voluntary manslaughter based upon imperfect defense-of-others. See *State v. Harris*, 293 Kan. 798, 803, 269 P.3d 820 (2012) ("Imperfect [defense-of-others] may trigger a lesser degree of homicide, but it is not a defense to criminal liability."). The instruction that Roeder proffered was based on PIK Crim. 3d 56.05 and provided:

"If you do not agree that the defendant is guilty of First Degree Murder, you should then consider the lesser included offense of Voluntary Manslaughter[.]
"To establish this charge, each of the following claims must be proved:
1. That the defendant intentionally killed George Tiller;
2. That it was done upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person[;]
3. That this act occurred on or about the 31st day of March, 2009, in Sedgwick County, Kansas."

Defense counsel argued that Roeder's testimony established that he honestly believed that he had to kill Dr. Tiller when he did it to protect the unborn children that were in danger of imminent harm because of the abortions scheduled for the following day. The district court denied the instruction because the doctor was not engaging in any unlawful conduct at his abortion clinic and because "there [was] no imminence of danger on a Sunday morning in the back of a church." Moreover, the district court found that the subjective part of the analysis related to the "unreasonable but honest belief" language of K.S.A. 21-3403 but that "[w]hen we return to the statutory elements under K.S.A. 21-3211, those become objective." We agree.

*Standard of Review*

We recently clarified our standard of review for jury instruction issues:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Analysis*

Roeder properly preserved this issue for appellate review by requesting a voluntary manslaughter instruction and distinctly stating the grounds for its inclusion. See K.S.A. 22-3414(3) (establishing preservation rule for lesser included crime instructions).

Furthermore, Roeder's requested instruction was legally appropriate, as our caselaw "has long held that voluntary manslaughter is a lesser included offense of first-degree premeditated murder under K.S.A. 21-3107(2)(a)." *State v. Qualls*, 297 Kan. 61, 69, 298 P.3d 311 (2013).

The controlling question here is whether the instruction, viewed in the light most favorable to Roeder, was factually appropriate. *Qualls*, 297 Kan. at 69. "District courts have a duty to issue instructions on any lesser included offense established by the evidence . . . ." *State v. Nelson*, 291 Kan. 475, 480, 243 P.3d 343 (2010) (citing K.S.A. 22-3414[3], which requires an instruction "'where there is some evidence which would reasonably justify a conviction of some lesser included crime'").

The statutory definition of the requested version of voluntary manslaughter is found in K.S.A. 21-3403(b), which requires an "intentional killing of a human being committed . . . (b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto." Two of the referenced statutes, K.S.A. 21-3212 and K.S.A. 21-3213, deal with the use of force in defense of property, and, consequently, they have no bearing on our inquiry in this case. The self-defense statute referenced in the definition of voluntary manslaughter that is applicable here is K.S.A. 21-3211, the relevant portions of which state:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend . . . a third person against such other's imminent use of unlawful force.
> "(b) A person is justified in the use of deadly force under the circumstances described in subsection (a) if such person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to . . . a third person."

25

Roeder suggests that his actions fit within the parameters of an imperfect defense-of-others voluntary manslaughter because of his honestly held religious belief that an abortion kills a person. In other words, Roeder contends that his subjective belief that he was saving others' lives by killing Dr. Tiller was all that mattered, even if that belief was objectively unreasonable in all respects and even if the belief was contrary to the law. Roeder reads the definition of imperfect defense-of-others voluntary manslaughter too broadly.

Granted, Roeder can point to expansive language in *State v. Ordway*, 261 Kan. 776, 934 P.2d 94 (1997), to support the notion that the only consideration under K.S.A. 21-3403(b) is whether the defendant honestly believed his action was necessary to defend others, regardless of the circumstances. Ordway killed his parents because voices in his head told him he needed to do so to save his sons from being killed by the parents. The *Ordway* court declared that "[b]oth elements in the offense of voluntary manslaughter as defined in [K.S.A.] 21-3403(b) are subjective" and that "the 'objective elements' of [K.S.A.] 21-3211 [(Ensley)]—an aggressor, imminence, and unlawful force—would not come in for consideration." 261 Kan. at 787.

Black's Law Dictionary currently defines "subjective" as: "1. Based on an individual's perceptions, feelings, or intentions, as opposed to externally verifiable phenomena . . . . 2. Personal; individual . . . ." Black's Law Dictionary 1652 (10th ed. 2014). In that vein, *Ordway*'s stated interpretation of K.S.A. 21-3403(b) would mean that a defendant's personal and individual perception or feeling that deadly force was necessary to defend others, standing alone, would meet the definition of imperfect defense-of-others voluntary manslaughter without regard to the externally verifiable phenomena surrounding the crime. That interpretation would negate the fundamental notion that everyone is presumed to know the law and one cannot use as a defense his or

26

her subjective belief that the law is or should be something different. See *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 536, 646 P.2d 1091 (1982) (stating the "ancient maxim, 'Ignorance of the law is no excuse'"). Carried to the extreme, one could argue that, based purely on subjective belief, the Islamic terrorists who killed Americans on September 11, 2001, would fit within the definition of those entitled to claim imperfect defense-of-others, as would a death penalty opponent who might kill the warden at the Huntsville Prison in Texas to prevent further prisoner executions.

Yet, even *Ordway* does not appear to have applied that sweeping principle of pure subjectivity when reaching its ultimate holding; *Ordway* affirmed the district court's refusal to give a lesser included offense instruction on voluntary manslaughter. In reaching that decision, the *Ordway* court did not focus on what the defendant personally and individually perceived or felt, but rather it fashioned a rule based upon the underlying *reason* that the defendant subjectively believed deadly force was necessary. Specifically, *Ordway*'s penultimate ruling was that "the 'unreasonable but honest belief' necessary to support the 'imperfect right to self-defense manslaughter' cannot be based upon a psychotic delusion." 261 Kan. at 790. The opinion did not explain why excluding those whose subjective belief derived from a psychotic delusion is not, in essence, the application of an objective criterion to narrow the class of persons entitled to the voluntary manslaughter instruction. Moreover, we can only speculate whether *Ordway* intended for the constraint on subjectivity to apply to others whose belief may have been the product of aberrant mental processes, *e.g.*, brainwashed cult members or religiously indoctrinated terrorists.

More importantly, the purely subjective interpretation does not comport with the statutory language of K.S.A. 21-3403(b). If the legislature had intended to allow a defendant to make up his or her own version of the law based upon the defendant's declaration of an honest belief, the statute could have simply defined the crime as an

intentional killing of a human being committed upon an unreasonable but honest belief that circumstances existed that justified deadly force. But the statute adds something; it requires that the honest belief has to be "that circumstances existed that justified deadly force *under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto.*" (Emphasis added.) K.S.A. 21-3403(b).

The statutory reference to the perfect defense statutes has to mean something because we do not interpret statutes in such a manner as to render portions superfluous or meaningless. See *State v. Van Hoet*, 277 Kan. 815, 826-27, 89 P.3d 606 (2004) ("The court should avoid interpreting a statute in such a way that part of it becomes surplusage."). The logical interpretation is that the circumstances which the defendant honestly believed to exist must have been such as would have supported a claim of perfect self-defense or defense-of-others, if true. Accord *People v. Enraca*, 53 Cal. 4th 735, 761, 137 Cal. Rptr. 3d 117, 269 P.3d 543 ("'To make the observation in *In re Christian S.*[, 7 Cal. 4th 768, 773 n.1, 30 Cal. Rptr. 2d 33, 872 P.2d 574 (1994),] more general, not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense.'"), *cert. denied* 133 S. Ct. 225 (2012).

Subsequently, in *State v. White*, 284 Kan. 333, 161 P.3d 208 (2007), this court did not follow *Ordway*'s suggestion to completely disregard the objective element of imminence when considering imperfect defense-of-others voluntary manslaughter. There, White believed that his son-in-law was sexually abusing White's grandson, so he shot and killed the son-in-law in the Wal-Mart while the son-in-law was working. White asserted imperfect defense-of-others, and the State countered that White presented no evidence that the grandson was in imminent danger from the son-in-law at the time of the shooting. This court agreed with the State, reasoning:

28

"[T]he evidence relied upon by White explains why he might have believed that B.A.W. had previously been abused or would be abused in the future. But White did not provide *any* evidence that he believed B.A.W. was in imminent danger at the time of the shooting. At that time, Aaron, the purported abuser, was not in the presence of B.A.W., the purported victim. Indeed, because White went to Aaron's Wal-Mart work-place, it would be quite difficult for him to present evidence that he honestly believed his 5-year-old grandson was there and that abuse was imminent." 284 Kan. at 353.

*White* looked to California caselaw for guidance on imperfect defense-of-self-or-others. Specifically, we referred to *In re Christian S.*, where the California Supreme Court "held that '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.' 7 Cal. 4th at 783. It concluded that 'the trier of fact must find an *actual* fear of an *imminent* harm. . . .' 7 Cal. 4th at 783." 284 Kan. at 352. As noted above, the *Enraca* court extrapolated from *Christian S.* the general rule that an imperfect self-defense claim is only available where the unreasonable beliefs would have supported a perfect self-defense claim if they had been reasonable beliefs. 53 Cal. 4th at 761.

*White* also discussed *Menendez v. Terhune*, 422 F.3d 1012 (9th Cir. 2005), where the Menendez brothers, Erik and Lyle, were convicted in California state court of two counts each of first-degree murder for shooting their defenseless parents with numerous shotgun blasts. The brothers' petitions for writs of habeas corpus to the Ninth Circuit Court of Appeals alleged, *inter alia*, that the decision not to instruct the jury on imperfect self-defense violated the brothers' rights to due process. The state trial and appellate courts found that an imperfect self-defense instruction was not warranted because the brothers were unable to show a belief that danger was imminent. 422 F.3d at 1028-29.

In denying relief, the Ninth Circuit discussed the brothers' evidence establishing that they were repeatedly abused by their father and that their mother had acquiesced in

29

the abuse. But the court found that this focus on past abuse was unpersuasive because it fell short of establishing that "at the moment [Erik] shotgunned his parents to death, he feared he was in imminent peril." 422 F.3d at 1030. The court found that even Erik's belief that "his parents would kill him when they exited the room [was] insufficient to support the instruction" because, assuming this testimony was true, the killings were preemptive strikes. 422 F.3d at 1030.

Recently, we reached a different result in *Qualls*, where we found that the district court's failure to give an imperfect self-defense instruction created reversible error. Qualls admitted shooting the victim in a bar fight but argued for a voluntary manslaughter instruction based on his honest but unreasonable belief that lethal force was justified. Specifically, Qualls testified that he saw the victim reach for his waist; that he saw something that he believed was a gun; and that he responded by shooting the victim in self-defense. *Qualls* held that the district court should not have applied an objective standard to determine that the victim's hand at his waist did not warrant an imperfect self-defense instruction, but rather the question was "whether there was evidence of Qualls' subjective belief that unlawful force was imminent when that evidence is viewed in the light most favorable to Qualls." 297 Kan. at 70. In that case, pursuant to the rationale in the *Enraca* case described above, the voluntary manslaughter instruction was factually appropriate because the defendant's honest belief that the victim was drawing a gun from his waistband would have fit the statutory requirements for a perfect self-defense set forth in K.S.A. 21-3211 if the belief had been reasonable, *i.e.*, if the circumstances believed to exist were true.

In contrast to *Qualls*, here, even if the circumstances that Roeder believed existed had been true—that Dr. Tiller would be performing abortions the following day—those circumstances would not have supported a claim of perfect defense-of-others. For that defense to apply under K.S.A. 21-3211(a), Roeder had to be defending against Dr.

Tiller's "imminent use of unlawful force" against a third person. Even ignoring the question of whether a fetus is a third person, the defense could not stand.

As the trial court aptly noted, no use of force was imminent in the church foyer that Sunday morning. Moreover, the facts belie the notion that Roeder committed the crime when and where he did because of an honest belief in the imminence of harm. To the contrary, he coldly calculated the time and place that gave him the best odds of successfully completing his planned murder. Additionally, given that abortions are lawful, Roeder could not have been defending against *unlawful force*, as required for perfect defense-of-others. Even if the doctor had failed to comply with all of the rules and regulations governing abortions, the use of the force required to accomplish the abortion would not have been unlawful.

Finally, we would note that Roeder's argument that he honestly believed that Dr. Tiller was performing unlawful abortions based upon the attorney general investigations and allegations that the doctor was violating administrative protocol is simply disingenuous. Roeder testified that he formed the belief that he needed to kill Dr. Tiller over a decade prior to any attorney general investigation. Further, he clearly testified that he sought to stop *all* abortions, including those that were legal under the law.

Consequently, we affirm the district court's denial of Roeder's request for an imperfect defense-of-others voluntary manslaughter instruction.

### RIGHT TO PRESENT A DEFENSE

Closely related to his argument that the district court erred in denying his requested lesser included offense instruction on voluntary manslaughter—imperfect

31

defense-of-others, Roeder argues that the district court violated his due process right to present this defense.

*Standard of Review*

"When a criminal defendant claims that a district judge has interfered with his or her constitutional right to present a defense, we review the issue de novo." *State v. Carter*, 284 Kan. 312, 318-19, 160 P.3d 457 (2007) (citing *State v. Kleypas*, 272 Kan. 894, 921-22, 40 P.3d 139 [2001], *cert. denied* 537 U.S. 834 [2002]).

*Analysis*

A defendant has a right to present his or her theory of defense, but that right is subject to some constraints, to-wit:

> "Under our state and federal constitutions, a defendant is entitled to present the theory of his or her defense. *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). The defendant's fundamental right to a fair trial is violated if relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense is excluded. See *State v. Mays*, 254 Kan. 479, 487, 866 P.2d 1037 (1994).
>
> "However, the right to present a defense is subject to statutory rules and case law interpretation of the rules of evidence and procedure. *State v. Thomas*, 252 Kan. 564, 573, 847 P.2d 1219 (1993). An appellate court's first consideration when examining a challenge to a district court's admission of evidence is relevance. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. *State v. Carter*, 278 Kan. 74, Syl. ¶ 1, 91 P.3d 1162 (2004)." *State v. Patton*, 280 Kan. 146, 156, 120 P.3d 760 (2005), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 55-56, 144 P.3d 647 (2006).

Roeder argues that the district court interfered with his right to present a voluntary manslaughter defense when the court: (1) quashed Barry Disney's subpoena; (2) excluded Disney and Phill Kline from testifying in Roeder's defense; (3) ordered the defense to proffer Roeder's and Kline's testimony; (4) denied Roeder's motion to take judicial notice and instruct the jury of the two criminal cases against Dr. Tiller; and (5) limited Roeder's testimony during direct examination.

*Quashing Disney's Subpoena*

After the district court granted the motion to quash the subpoena issued to Deputy Attorney General Barry Disney, Roeder's counsel made the following proffer:

"As to Barry Disney, we believe Mr. Disney, if he had been allowed to testify, would have indicated he is a licensed attorney. He is employed by the Attorney General's office, working out of Topeka, Kansas. He became the lead prosecutor in the case *State v. Tiller*, captioned 07 CR 2112. He prosecuted in front of a jury a 19-count Complaint alleging—the gist of the allegations were all the same, that he failed to, at least on 19 occasions, obtain an independent second opinion relative to the patient on whom he had performed an abortion. Furthermore, we anticipate that he would have testified that Dr. Tiller was acquitted on all 19 charges."

Roeder argues that the district court erroneously applied K.S.A. 60-245(c)(3)(A), which provides:

"(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it:
(i) Fails to allow reasonable time for compliance;
(ii) requires a resident of this state who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person or requires a nonresident who is not a

33

party or an officer of a party to travel to a place more than 100 miles from the place where the nonresident was served with the subpoena, is employed or regularly transacts business, except that, subject to the provisions of subsection (c)(3)(B)(iii), such a nonparty may in order to attend trial be commanded to travel to the place of trial;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden."

Roeder argues that the facts of this case did not meet any of the four provisions in K.S.A. 60-245(c)(3)(A). But we have also recognized the "well-established principle that district courts have the authority, independent of a statutory privilege, to prevent or limit the power of compulsory process when necessary to prevent abuse, harassment, undue burden or expense, to manage litigation, to prevent violation of constitutionally protected interests, and to protect confidential matters." *State v. Gonzalez*, 290 Kan. 747, 767, 234 P.3d 1 (2010). Pertinent here, our caselaw provides that "[s]ubpoenas in aid of civil or criminal litigation are subject to stringent relevancy requirements." 290 Kan. at 767 (citing *State ex rel. Stephan v. Clark*, 243 Kan. 561, 568, 759 P.2d 119 [1988]); see also 98 C.J.S., Witnesses § 25 ("In a proper case, the prosecution may seek to quash a defendant's subpoena where the testimony that is sought is neither relevant nor material to the issues involved.").

Roeder contends that Disney's testimony was relevant to show the jury that Roeder had a basis in fact to believe that Dr. Tiller was not complying with the law when performing abortions. The district court ruled that establishing Disney's good faith in prosecuting Dr. Tiller was "unnecessary" and that any questioning in that regard would invade Disney's mental impressions. The district court also noted that it would be redundant for Disney to testify that he had a good faith basis to prosecute Dr. Tiller, given that the law and a prosecutor's professional ethics require that good faith. The court further reasoned that "Roeder is not going to be able to corroborate or validate his beliefs

34

by bringing in collateral sources, be it Mr. Disney, Mr. Phill Kline, or anybody else's opinion on the legality or illegality of what Dr. Tiller was doing."

Given that we have held in the foregoing issue that Dr. Tiller's failure to comply with some administrative or procedural requirement would not transform the actual abortion into an unlawful use of force within the meaning of the defense-of-others statute, Disney's testimony was no more relevant to these proceedings than the price of wheat in Kansas. Accordingly, the district court made the correct decision. See *State v. Bryant*, 272 Kan. 1204, 1210, 38 P.3d 661 (2002) (district court's correct decision may be upheld even where rationale not articulated).

*Excluding Disney and Kline from Testifying in Roeder's Defense*

Roeder also argues that the district court erred by excluding Disney's and Kline's testimony. In addition to quashing Disney's subpoena, the district court, over Roeder's objection, required Roeder to proffer Kline's testimony. Kline's proffered testimony discussed his investigation into Dr. Tiller's abortion practice while Kline served as the Kansas Attorney General. Kline testified that the investigation involved potential criminal late-term abortions and failure to report sexual abuse of children. He also testified that he came to a good faith conclusion that Dr. Tiller was performing unlawful abortions and discussed the criminal charges he filed against Dr. Tiller on December 21, 2006. But Kline clarified that he thought Roeder was not justified in killing Dr. Tiller and that Roeder's actions were unreasonable.

The district court ruled that Kline could not testify. The court first noted that portions of Kline's testimony were irrelevant and immaterial because the testimony discussed private inquisitions and records. The court then found that Kline's testimony regarding the charges made public involved Kline's legal theories, which were not

35

matters for jurors as factfinders to consider. The district court ruled that Roeder could testify regarding how the dismissal and acquittal impacted him. But the district court found that Disney and Kline had no insight into how their legal maneuvers impacted Roeder.

Roeder argues that the district court erred in excluding Disney and Kline from testifying in his defense because the evidence was relevant to Roeder's subjective beliefs. Again, we disagree and find Roeder's citation to the Maryland decision in *Simmons v. State*, 313 Md. 33, 542 A.2d 1258 (1988), to be inapposite here. *Simmons* involved the exclusion of the expert testimony of a psychiatrist on the issue of Simmons' asserted subjective belief. Yet, Roeder does not even attempt to argue that either Disney or Kline would have had the expertise to discuss Roeder's psychological profile.

In a pro se supplemental brief, Roeder makes the argument that Kline's testimony would have been relevant to show the reasonableness of Roeder's beliefs for the perfect defense-of-others under K.S.A. 21-3211. But Roeder fails to connect the dots between Kline's failed pursuit of technical abortion statute violations against Dr. Tiller and whether a rational, objective person would commit premeditated murder of a person with whom that person had theological disagreements. In other words, the proffered testimony had no relevance on any issue before the jury in this prosecution.

*Ordering Defense to Proffer Kline's and Roeder's Testimony*

Roeder also argues that the district court infringed on his constitutional rights and failed to ensure his right to a fair trial by ordering defense counsel to proffer his testimony before the State had rested its case. The district court explained:

"If he chooses to testify, there is going to be a proffer made by counsel, because he is not going to get up there and get to just blurt out whatever he wants to say. I agree. It has to be relevant and material. But until I hear the proffer, I can't even judge if it's irrelevant or immaterial, nor can I do that on Phill Kline."

Roeder argues that the proffer under these circumstances was improper and any objections to his testimony should have been done during direct examination. Roeder argues that the State gained an advantage because the State was able to "'preview'" Roeder's direct examination, allowing the State to make numerous timely objections to his testimony.

Roeder's argument that he should not have been required to proffer a summary of his or his witness' testimony before the State had rested its case-in-chief has merit. "The purpose of a proffer is to make an adequate record of the evidence to be introduced" in order to preserve the issue for appeal. *State v. Evans*, 275 Kan. 95, 99, 62 P.3d 220 (2003). Here, the district court erred in requiring Roeder to proffer his testimony before the testimony was presented.

Nevertheless, given that the testimony of both Kline and Roeder on this issue was irrelevant on the imperfect defense-of-others defense, the error was harmless. There was no reasonable possibility that the error contributed to the verdict. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

*Denying Roeder's Motion to Take Judicial Notice and Instruct the Jury on the Two Criminal Cases Against Dr. Tiller*

Roeder next argues that the district court erred in denying his motion to take judicial notice of the two criminal cases filed against Dr. Tiller. Instead of taking judicial notice, the district court allowed Roeder to testify to the facts surrounding Dr. Tiller's

37

prior trials and "how those facts affected his thinking process and ultimately his decision to act the way he did." We discern that the district court permitted more evidence to be introduced on the imperfect defense-of-others issue than was warranted by the concept of relevancy. The court did not err in refusing the requested judicial notice.

*Limiting Roeder's Testimony During Direct Examination*

Roeder points to several instances during his direct examination where the district court limited his discussion of Dr. Tiller's abortion practices. Roeder argues that the district court should have followed its earlier ruling that Roeder could testify regarding "his personally-held beliefs just in general about abortion, whether it is harmful, whether it terminates a viable baby."

A review of Roeder's testimony shows that the district court allowed Roeder to testify on each of the issues identified in the district court's earlier ruling and only limited Roeder's testimony when Roeder attempted to discuss matters we have deemed irrelevant and completely off-base. The trial court's patience is applauded, and we find no error in the court controlling the trial by limiting testimony, where necessary.

PROSECUTORIAL MISCONDUCT

Roeder claims that the prosecutor committed misconduct during the rebuttal portion of closing argument by (1) appealing to the passion and prejudice of the jury, and (2) encouraging the jury to consider factors outside of the evidence. We find that the majority of the prosecutor's comments were not outside the wide latitude a prosecutor is allowed and, therefore, did not constitute misconduct. To the extent the prosecutor's comments exceeded this wide latitude, the comments were unequivocally harmless.

38

*Standard of Review/Applicable Tests*

A claim of prosecutorial misconduct based on comments made during closing argument will be reviewed on appeal, even where, as in this case, there was no contemporaneous objection. See *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). Such review involves a two-step process. First, we decide whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012). If the comments were improper and constituted misconduct, we then determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. 294 Kan. at 856. Under this second step, we consider three factors. First, was the misconduct gross and flagrant? Second, was the misconduct motivated by ill will? Third, was the evidence of such a direct and overwhelming nature that the misconduct would have had little weight in the mind of a juror? *State v. Bridges*, 297 Kan. 989, Syl. ¶ 15, 306 P.3d 244 (2013). None of the three factors is individually controlling. *State v. Adams*, 292 Kan. 60, 66, 253 P.3d 5 (2011).

Finally, in considering the third factor, this court requires that the prosecutorial misconduct error meets the "dual standard" of both constitutional and statutory harmlessness in order to uphold a conviction. *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004). The State bears the burden of demonstrating harmlessness under both standards. However, if the State meets the higher constitutional harmless error standard, the State necessarily meets the lower statutory standard under K.S.A. 2013 Supp. 60-261. See *Bridges*, 297 Kan. at 1012-13, 1015. The constitutional, or *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), harmless error standard provides that

"error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Ward*, 292 Kan. 541, Syl. ¶ 6 (citing *Chapman*, 386 U.S. 18).

*Analysis*

Roeder challenges the rebuttal portion of the State's closing argument. The State argues that the comments Roeder now challenges were made in response to defense counsel's closing argument; therefore, to the extent that any portion of the prosecutor's rebuttal was suspect, the prosecutor was attempting to redirect the jury back to its duties and counter the defendant's plea to the jury to base its decision on passion. To support this argument, the State cites to *State v. Murray*, 285 Kan. 503, 517, 174 P.3d 407 (2008), where we stated: "[N]o prejudicial error occurs—including prosecutorial misconduct— where the questionable statements are provoked and made in response to prior arguments or statements by defense counsel."

Shortly after the State filed its brief, we noted two disparate lines of reasoning regarding the "open-the-door" rule in prosecutorial misconduct cases and reaffirmed that "[t]he open-the-door rule does not insulate a prosecutor from a finding of misconduct." *Marshall*, 294 Kan. at 860. Therefore, "a prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting arguments made by defense counsel. The extemporaneous, rebuttal nature of a prosecutor's argument is merely a factor to be considered by an appellate court." 294 Kan. at 861; see also *State v. Stimec*, 297 Kan. 126, 130, 298 P.3d 354 (2013) ("In short, defendants do not open the door to prosecutorial misconduct.").

40

Although not determinative of this issue, the rebuttal nature of the prosecutor's argument is still a factor we consider. In Roeder's closing argument, defense counsel argued that after the trial, the abortion debate "will rage on." He discussed some of history's tragedies including the inhumane treatment of Native Americans, Stalin's "purges in Mother Russia," and Hitler's "incomprehensible slaughter of 6 million Jews." He noted that we "remember and we celebrate individuals who stood up and made the world a better place" such as Dr. Martin Luther King, Jr. Defense counsel concluded his argument by stating:

"Wichita changed on May 31st, 2009. I think that can't be disputed. We are going to ask you to all collectively fulfill your duties, and in your verdict represent our little part of the nation well. The State as well as Scott Roeder provided to you that he killed Dr. George Tiller, but only you collectively can determine if he murdered George Tiller. No defendant should ever be convicted based upon his convictions. We ask you not to convict the defendant. We are going to ask you to acquit Scott Roeder of first degree murder."

Roeder challenges the italicized portion of the State's rebuttal argument:

"*On May 31st, that quiet Sunday, Wichita did change. It changed from a quiet community celebrating their Sabbath to a community terrorized.* We are a society of laws. We each rely on it every day. We rely on judges, we rely on legislators, and we rely on jurors taking an oath to follow the law, as each of you have done.

"But *on that day and the days before, when Scott Roeder contemplated taking the law into his own hands, he took it from the rest of us. . . .*

. . . .

"*And while Gary Hoepner lives, as you saw even today, with the guilt of failing to stop the man, the killer, the defendant feels relieved at his success. And while in this courtroom the defendant*[] *pick*[*s*] *through the State's case at the various witnesses and act*[*s*] *incredulous after answers, the defendant is preparing his testimony, where he can*

41

*proudly in a public forum take credit for his murder. And while he does so, it sends chills down the backs of conscientious people.*" (Emphasis added.)

Roeder argues that the prosecutor's argument, "while Gary Hoepner lives, as you saw even today, with the guilt of failing to stop the man, the killer, the defendant feels relieved at his success," was not commentary on the evidence but was a judgment designed to arouse jurors' anger. We disagree and find these comments were based upon evidence presented at trial. During Hoepner's examination, the prosecutor read a portion of Hoepner's interview with investigators where Hoepner said, "'I wanted to apprehend the guy myself. I really felt bad that I couldn't have.'" During Roeder's testimony, Roeder admitted that he felt "[a] sense of relief" that Dr. Tiller's clinic was shut down. Roeder also testified that he did not regret what he did. Therefore, we find this challenged portion of the prosecutor's closing argument was within the wide latitude a prosecutor is allowed to discuss the evidence presented at trial.

Roeder also takes issue with the prosecutor's statement, "[W]hile in this courtroom the defendant[] pick[s] through the State's case at the various witnesses and act[s] incredulous after answers, the defendant is preparing his testimony, where he can proudly in a public forum take credit for his murder." We find this portion of the State's closing argument is comparable to *State v. Finley*, 273 Kan. 237, 244, 42 P.3d 723 (2002), where Finley argued that the prosecutor improperly appealed to community interests by arguing, "'He's not accepting responsibility for what he did. And his behaviors are exactly why we have this felony murder rule. He cannot expect to get away with this killing.'" As we found in *Finley*, the prosecutor's comments were "based on a fair inference drawn from the evidence." 273 Kan. at 244.

Two of the prosecutor's comments arguably appealed to the jurors' passion and prejudice and encouraged the jury to consider factors outside of the evidence. The

42

prosecutor argued that Wichita was "terrorized" by Roeder's actions. The prosecutor also argued that Roeder's conduct "sends chills down the backs of conscientious people." Roeder argues that these statements distracted the jury from its role as factfinder and were designed to elicit anger and resentment in the jury. We have "repeatedly emphasized that it is improper for a prosecutor to comment on facts not in evidence, to divert the jury's attention from its role as factfinder, or to make comments that serve no purpose other than to inflame the passions and prejudices of the jury." *Stimec*, 297 Kan. at 128-29.

In *Stimec*, we found that a prosecutor's comments during the rebuttal portion of closing argument were improper for a number of reasons, including that they appealed to the passions of the jury and diverted the jury's attention from the case. There, the State presented evidence that Stimec's 6-year-old son, J.S., spent every other weekend with Stimec. One weekend, when J.S. returned to his mother's house, J.S. told her that he and Stimec put lotion on each other, including each other's private parts. In his defense, Stimec asserted that he put lotion on his son but never in inappropriate places and argued consistent with this assertion during his closing argument. In rebuttal, the State argued:

> "'It is not illegal to put lotion on a child's back. It is not illegal to put it on their ankles, knees, shoulders, head, anywhere else. None of that is a crime, absolutely, but it is a crime to stroke your son's penis with lotion. I mean, let's just call it what it is, okay, that's a crime. You know what, feel free to take a poll in the jury room when you go to deliberate, take a poll. If there is one member of this panel who has stroked their son's penis with lotion, then by all means, find that way. I suspect that won't be the case.'" 297 Kan. at 128.

This court found that the prosecutor's suggestion to the jury to take a poll in the jury room was inappropriate and in error. 297 Kan. at 129.

Obviously, the prosecutor's statements in *Stimec* were exponentially more egregious than the prosecutor's statements in this case. Nevertheless, in the abstract, one could question the prosecutor's reference to a "community terrorized" or to the characterization of Roeder's cavalier attitude as "[sending] chills down the backs of conscientious people." But, cutting to the bottom line, there is no possibility whatsoever that the relatively innocuous comments by the prosecutor in an emotionally charged trial had any effect on the trial's outcome given that the defendant not only admitted killing Dr. Tiller, but also essentially bragged about committing the crime.

## SECOND-DEGREE MURDER LESSER INCLUDED OFFENSE INSTRUCTION

Roeder argues that the district court erred in failing to give his requested second-degree murder lesser included offense instruction. Because Roeder requested the instruction, this issue is preserved for review. Furthermore, second-degree intentional murder is a lesser included offense of premeditated first-degree murder; therefore, the instruction would have been legally appropriate. See *State v. Haberlein*, 296 Kan. 195, 204, 290 P.3d 640 (2012), *cert. denied* 134 S. Ct. 148 (2013). The State questions whether the second-degree murder instruction was factually appropriate. See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

Although Roeder makes the unintelligible argument that the right to a jury trial in serious criminal cases is part of the State's obligation under due process of the law, we fail to discern how the instructional challenge rises to the level of a constitutional error. But we need not get bogged down debating the propriety of giving a second-degree murder lesser included offense instruction in this case. If the district court erred in failing to give the requested second-degree murder instruction, it was harmless beyond all possible doubt.

Roeder testified that he had planned on killing Dr. Tiller since 1993. A defendant's own testimony that he or she contemplated and planned to kill a specific person for approximately 16 years is irrefutable evidence that the defendant thought the matter over beforehand, *i.e.*, that the defendant committed premeditated murder, rather than instantaneous murder. Roeder's defense was that he was justified in committing the murder. A jury either had to convict of premeditated murder or acquit based upon jury nullification. No reversal here. See *Ward*, 292 Kan. 541, Syl. ¶ 6.

## DEFENSE-OF-OTHERS INSTRUCTION

Roeder also argues that the district court erred in failing to give his requested perfect defense-of-others instruction. Roeder's requested instruction was based on PIK Crim. 3d 54.17 and stated:

> "Scott Roeder claims his use of force was permitted as the defense of another person(s).
> "Scott Roeder is permitted to use force against another person when and to the extent that is appears to him and he reasonably believes such force is necessary to defend someone else against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.
> "When use of force is permitted [in] defense of someone else, there is no requirement to retreat."

Because Roeder requested the instruction, this issue is preserved for review. We next turn to whether the instruction was legally appropriate. *Plummer*, 295 Kan. 156, Syl. ¶ 1. We conclude that it was not. As previously stated, K.S.A. 21-3211 sets out a two-part test:

45

"'The first is *subjective* and requires a showing that [Roeder] sincerely and honestly believed it was necessary to kill to defend [himself] or others. The second prong is an *objective* standard and requires a showing that a reasonable person in [Roeder's] circumstances would have perceived the use of deadly force in self-defense as necessary. [Citation omitted.]' (Emphasis added.)" *State v. Friday*, 297 Kan. 1023, 1037, 306 P.3d 265 (2013) (quoting *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 [2012]).

Roeder recognizes that the defense-of-others requires both a subjective and a reasonable belief that the use of force is necessary; however, he argues that viewing the evidence in a light most favorable to him, a rational factfinder could find that he reasonably (objectively) believed that his use of force was necessary. Stepping out of the delusional world in which Roeder apparently resides, no rational person would reasonably believe that deadly force was needed against an imminent use of unlawful force in this case.

In *State v. Hernandez*, 253 Kan. 705, 713, 861 P.2d 814 (1993), we found that a defense-of-others instruction was not warranted when Hernandez asserted he shot a man to protect his sister from the victim. Hernandez established a history of domestic violence between his sister and the victim. We rejected a finding of imminence even though Hernandez presented evidence that the victim had threatened to kill his sister at 11 a.m. on the day Hernandez shot the victim and that his sister was working in the adjoining factory when the shooting took place.

Here, even viewing the evidence in a light most favorable to Roeder, the harm he sought to prevent was 22 hours away. This danger was remote when compared to the *Hernandez* circumstances, which we found were not sufficient to establish imminence. We need not recount the other reasons that the requested defense-of-others instruction was not legally appropriate. This was not a close call.

Alternatively, Roeder claims that even if none of the singular errors addressed above warrant reversal, their cumulative effect requires reversal. The State counters that Roeder failed to establish any trial error and that the evidence overwhelmingly established his guilt. Our findings that the prosecutor committed misconduct during the rebuttal portion of her closing argument and that the district court might have erred in failing to instruct the jury on second-degree murder refute the State's claim of no trial error. Nevertheless, we find that the cumulative effect of those errors did not prejudice Roeder to the point of denying him a fair trial and decline to reverse on that basis.

*Standard of Review*

We utilize a de novo standard when determining whether the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error. *State v. Cruz*, 297 Kan. 1048, 1073-74, 307 P.3d 199 (2013). We recognize the cumulative error analysis is somewhat subjective. 297 Kan. at 1074. Our task is to determine whether the cumulative effect of both of the errors is such that collectively they cannot be determined to be harmless. "In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial?" *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

*Analysis*

As discussed above, the prosecutor's statements, although arguably misconduct, were very mild and were made in response to defense counsel's argument. Further, the abundant evidence of premeditation made any error in failing to provide a second-degree murder instruction harmless beyond a reasonable doubt. Consequently, especially in light

of the overwhelming evidence, we conclude that cumulative error did not affect the trial's outcome and did not deny Roeder a fair trial.

HARD 50 SENTENCE

Roeder argues that the district court erred in finding multiple aggravating circumstances that justified the imposition of a hard 50 sentence. Premeditated first-degree murder carries a life sentence with a mandatory minimum of 25 years before the defendant becomes parole eligible unless the State establishes that the defendant qualifies for an enhanced minimum sentence, here 50 years. *State v. Nelson*, 291 Kan. 475, 486, 243 P.3d 343 (2010) (citing K.S.A. 21-4635; K.S.A. 22-3717[b][1]). At the time Roeder was sentenced, the *district court* had to find *by a preponderance of the evidence* that one or more of the aggravated circumstances enumerated in K.S.A. 21-4636 existed and that they were not outweighed by any mitigating factors in order to enhance the minimum sentence. K.S.A. 21-4635(d); *Nelson*, 291 Kan. at 486-88.

Since Roeder's sentencing, we have held that a hard 50 sentence based upon a judge's own preponderance-of-the-evidence determination that an aggravating factor existed is unconstitutional and must be vacated. Specifically, in *State v. Soto*, 299 Kan. 102, Syl. ¶ 9, 322 P.3d 334 (2014), we held:

> "Kansas' statutory procedure for imposing a hard 50 sentence as provided in K.S.A. 21-4635 violates the Sixth Amendment to the United States Constitution as interpreted in *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2155, 2160-63, 186 L. Ed. 2d 314 (2013), because it permits a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence, rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt."

In accord with *Soto*, Roeder's hard 50 sentence was unconstitutionally imposed by the district court in violation of Roeder's Sixth Amendment right to a jury trial.

*Soto* considered, but did not definitively resolve, "whether a modified harmless error standard can apply to a hard 50 [Sixth Amendment] error." 299 Kan. at 128. *Soto* opined that "because Kansas' hard 50 scheme requires the sentencing court to not only find aggravating and mitigating circumstances, but to weigh any mitigating circumstances against aggravating circumstances, only in a rare instance could a hard 50/*Alleyne* error be harmless." 299 Kan. at 127. Like *Soto*, this case is not one of those rare cases where we can declare that the district court's utilization of an unconstitutional sentencing scheme was harmless as a matter of law. Accordingly, we must vacate Roeder's hard 50 sentence and remand for resentencing.

In *Soto*, we acknowledged that in response to *Alleyne*, at a September 2013 special session, the Kansas Legislature amended the hard 50 sentencing scheme to assign the applicable fact-finding to a jury utilizing the beyond a reasonable doubt burden of proof. 299 Kan. at 128; see L. 2013, ch. 1, sec. 1 (Special Session). That special legislation contained a retroactivity provision, to-wit:

> "'[F]or all cases on appeal on or after the effective date of this act, if a sentence imposed under . . . K.S.A. 21-4635, prior to its repeal, is vacated for any reason other than sufficiency of the evidence as to all aggravating circumstances, resentencing shall be required under this section, as amended by this act, unless the prosecuting attorney chooses not to pursue such a sentence.'" 299 Kan. at 128.

The *Soto* parties presented arguments on whether retroactive application of the special session hard 50 sentencing scheme would violate the Ex Post Facto Clause of the United States Constitution, albeit both parties conceded that the question would not be ripe until the State sought to apply the new scheme to *Soto*. The prosecutor could decide

49

not to pursue a hard 50 sentence on remand. Accordingly, *Soto* refrained from issuing an advisory opinion on the unripe ex post facto issue. 299 Kan. at 128-29.

Nevertheless, *Soto* chose to address the question of whether sufficient evidence supported the aggravating factor in that case, even though utilizing the new statute on remand would require evidence of the aggravating factor to be presented anew to a jury, *i.e.*, the evidence on resentencing could be different than in the current appeal. The reason given for that advisory opinion was that "[sub]section (e) of K.S.A. 2013 Supp. 21-6620 suggests the State would be precluded from pursuing a hard 50 sentence if this court had vacated Soto's sentence for lack of sufficient evidence to support the aggravating circumstance." 299 Kan. at 129. Later, the opinion intimated that resentencing under the new statute cannot occur if even one of the reasons for vacating a K.S.A. 21-4635 hard 50 sentence is the insufficiency of the evidence of the aggravating factor. See 299 Kan. at 130 ("Consequently, the sole reason we are vacating Soto's sentence is because it was imposed in violation of his Sixth Amendment right to a jury trial, as interpreted in *Alleyne*.").

Arguably, *Soto* went farther than was necessary in the appeal before it. Once the court determined that Soto's sentence had to be vacated because of the unconstitutional sentencing scheme, the question of whether sufficient evidence existed to meet the requirements of the unconstitutional statute was rendered moot. The sufficiency of the evidence of any aggravating factor described in the new statute, K.S.A. 2013 Supp. 21-6620, will only be germane when, or if, the prosecutor elects to seek resentencing under the new statute's retroactive provision in subsection (e).

Moreover, the retroactive provision speaks to applying the new statute where a sentence under the old statute has been "vacated for *any* reason *other than* sufficiency of the evidence as to all aggravating circumstances." (Emphasis added.) K.S.A. 2013 Supp.

21-6620(e). The Sixth Amendment violation that requires us to vacate Roeder's hard 50 sentence would fit within the category of "any reason other than sufficiency of the evidence." In other words, the plain language of the provision purports to apply the new sentencing scheme to this case because the old sentence is being vacated for a reason other than the insufficiency of the aggravating circumstances evidence. Whether the sentence might also have been subject to being vacated based upon an insufficiency of the evidence if the sentencing scheme had not been found unconstitutional is an academic question we need not answer.

In making this determination, we are not unmindful of *Soto*'s progeny, in which we opined on the sufficiency of the evidence to support the aggravating factors used to impose hard 50 sentences, even though we had vacated those sentences for the same Sixth Amendment violation. See *State v. Hayes*, 299 Kan. ___, 327 P.3d 414, 420 (2014); *State v. Lloyd*, 299 Kan. 620, 644-45, 325 P.3d 1122 (2014); *State v. DeAnda*, 299 Kan. 594, 603-05, 324 P.3d 1115 (2014); *State v. Astorga*, 299 Kan. 395, 402-04, 324 P.3d 1046 (2014); *State v. Hilt*, 299 Kan. 176, 204-05, 322 P.3d 367 (2014). Nevertheless, here, we simply vacate the hard 50 sentence under K.S.A. 21-4635 and remand for resentencing without further directions.

Roeder's convictions are affirmed, the hard 50 sentence for the first-degree premeditated murder conviction is vacated, and the matter is remanded for resentencing.

MORITZ, J., not participating.