NOT DESIGNATED FOR PUBLICATION

No. 112,958

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

K. DALENE MILLER
a/k/a KARLA D. MILLER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed June 24, 2016. Affirmed.

*Corrine E.Gunning*, of Kansas Appellate Defender Office, for appellant.

*Stefani K. Hepford*, assistant attorney general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, P.J., SCHROEDER, J., and JEFFREY E. GOERING, District Judge, assigned.

*Per Curiam*:  K. Dalene Miller appeals her jury trial convictions for mistreatment of a dependent adult and conspiracy to commit mistreatment of a dependent adult. Dalene claims the evidence was insufficient to support her convictions, the district court improperly instructed the jury on Viola's condonation of Dalene's actions, and the prosecutor committed error during her closing argument. Our review of the record reflects there was sufficient evidence to support Dalene's convictions; the district court improperly instructed the jury on condonation, but the error was harmless; and the prosecutor committed no misconduct. We affirm.

1

Following reports to Adult Protective Services by Presbyterian Manor of alleged elder abuse, the State charged Dalene with mistreatment of a dependent adult, or in the alternative, theft; and conspiracy to commit mistreatment of a dependent adult, or in the alternative, conspiracy to commit theft.

The alleged victim was Dalene's mother-in-law, Viola Miller. Viola had an adopted son, Rick Miller, with her first husband and five step-children with her second husband. Rick and Dalene were married in 1975. After Viola's second husband died, Rick voluntarily quit his job and began managing her farm.

In January 2003, several years after her second husband's death, Viola moved from her farm to an independent living apartment at Presbyterian Manor in Emporia with the help of her brother, Verl, and sister-in-law, Marilee. Verl also took Viola to attorney, Ted Hollembeak, to get her financial and legal affairs in order.

On March 5, 2003, Hollembeak helped Viola establish the Viola Miller Revocable Trust (the Trust) to provide for her future care and living expenses. The Trust was funded by Viola's assets. Under the terms of the Trust, Hollembeak was named trustee and held Viola's durable financial power of attorney.

After Hollembeak established the Trust, he notified Rick and Dalene he was the trustee and they would no longer have authority over Viola's finances. Additionally, Hollembeak wanted to enter into leases for Viola's land to provide her with regular income. Per Viola's wishes, Rick would have the first option to lease the land.

Dalene testified the letter was extremely upsetting because they felt as if Verl was attempting to go behind their back and change everything. "And pretty much, it was like

me and Rick were supposed to just leave." Shortly thereafter, Rick and Dalene had an appointment with Hollembeak and Viola. Rick informed Hollembeak that "things needed to be changed." Following that appointment, the Trust was amended several times with the final amendment dated October 10, 2005.

In September 2005, Hollembeak sent a letter to Dalene asking for a detailed accounting of Viola's income so he could determine how to meet Viola's expenses. Dalene failed to provide the information; instead, another appointment was held with Rick, Dalene, Viola, and Hollembeak resulting in the final amendment to the Trust, which appointed Dalene as trustee and appointed Rick as successor trustee. Hollembeak met alone with Viola prior to having her sign the amendment to make sure she really wanted Dalene listed as the trustee and to voice his concerns over prior acts by Rick and Dalene when they had access to Viola's finances and her bills were not paid. Hollembeak was concerned Viola's social security funds were being used for something other than Viola's needs. Dalene signed an acceptance of duties as trustee.

At trial, Dalene testified she did not understand the legality of the Trust and she only wanted to be trustee to save Viola money. While alive, Viola was the sole beneficiary of the Trust.

After Dalene took over as trustee, Presbyterian Manor had difficulty getting Viola's monthly bill paid. In the course of a 6-year period, Presbyterian Manor only received 15 payments and was forced to refer Viola's bill for collection. By the end of 2008, Viola's bill had gone unpaid for 18 months and accumulated to over $30,000. In 2011, following reports from Presbyterian Manor, Adult Protective Services began investigating allegations of neglect and fiduciary abuse.

At trial, witnesses testified that Viola began exhibiting noticeable signs of cognitive decline by 2010. Presbyterian Manor nurses noted Viola was beginning to

suffer falls; was confused about things like whether she was supposed to eat and where she should go; due to problems with her teeth, Viola could not chew and would spit food back out on the plate; and she began hoarding perishable food in her apartment. Nurse Marcia Taylor also noted Viola's clothing was no longer fitting properly and that she had an inadequate number of undergarments.

Debbie Burris, another nurse, and Taylor were also concerned whether Viola was taking her medications properly. Taylor had difficulty getting Viola's medications from Rick and Dalene, who were responsible to provide them for Viola. Dalene acknowledged to Burris in December 2010 she was not getting Viola's antidepressant, Lexapro, because they "didn't have enough money to purchase it." In the summer of 2011, Viola was still not receiving her antidepressant, and the pharmacy would not refill the prescription until Viola's doctor saw her again. Unfortunately, Viola's doctor, Dr. Kretsinger, would not see Viola because her bill was unpaid.

Dalene was aware of Viola's decline. Burris had multiple conversations with both Rick and Dalene about Viola's condition. Dalene acknowledged to Burris that Viola had short-term memory problems. During another conversation with Burris on June 26, 2011, Dalene remarked about Viola's flat affect and told Burris that Viola "can't put two and two together." The State also introduced evidence of cognitive evaluations of Viola performed by Burris and Dr. Stephen Benson. Dr. Benson's review of Viola's medical records, his meeting with Viola, and her cognitive evaluation led him to conclude that Viola could not make independent decisions about her health and welfare; she was incapable of understanding and managing her finances or of making independent decisions about her finances or property; she was susceptible to leading by others; and she could not protect her own interests. Dr. Benson further opined Viola's decline had begun as early as 2008, and most noticeably by 2010.

At trial, Dalene testified that around the same time Viola began declining, she and Rick were experiencing their own difficulties. In late 2009, Dalene lost her job as a nurse and shortly afterwards was diagnosed with breast cancer. Additionally, they lost their house at a foreclosure sale on December 2, 2010. During this time, Dalene was using the Trust to pay all of her and Rick's bills. Dalene testified:

> "Well, we had to live. It was a joint account and sharing farm and trying to keep things going and, like I said, Rick wasn't getting reimbursed for his farm work. I didn't get no reimbursement for being her caregiver. That little bit, I guess maybe you could count that as our payment for doing our job."

Rick began discussing with Viola the need to sell her land. In early 2011, Rick and Dalene met realtor Lacie Hamlin at an open house for a property called Shamrock Ranch. Although Viola had not previously wanted to sell any land, on July 6, 2011, a large portion of Viola's land held in the Trust was sold for $745,800 with about $45,000 in selling expenses. Viola attended the closing with Rick and Dalene. Viola also signed a deed for part of the land to place it in the Trust for purposes of the sale. Hamlin testified that at the closing, Viola seemed sweet and spunky.

At trial, the State's financial analyst, Cindy Ludwig, testified about the funds disbursed through the sale of Viola's land. A large portion of the money—$255,000—went towards the purchase of Shamrock Ranch to serve as a residence for Rick, Dalene, and their two sons. Another $295,000 went to an investment with Inland Exchange, which would pay approximately $1,400 per month in dividends. Finally, an additional $150,000 of cash was disbursed, mostly to the Trust account. Ludwig's analysis then traced the funds disbursed. In the course of approximately 2 months, $745,000 had been spent.

No funds of Rick and Dalene's ever went into the Trust. The monthly dividends from the Inland Exchange investment were never used to pay for Viola's care. Instead, the financial evidence showed the sale proceeds from Viola's land and investment were spent on things such as cigarettes, liquor, entertainment, restaurants, and a new pickup truck for Rick. Dalene testified the truck was for the farm, and she intended to pay $600 per month in rent to Viola in exchange for the house. When asked how the cigarettes and liquor purchases benefited Viola, Dalene replied: "Well, me being her trustee and needing some peace of mind. Sometimes you want to drink and a cigarette for mental capacity. And Viola did drink a little wine back in her day."

At the State's request, and over Dalene's objection, as part of the jury instructions, the district court gave the following instruction: "It is not a defense that the victim has excused the offense committed," to which Dalene objected because, "given our position that there wasn't actually a crime committed, there's no offense to actually excuse, by the alleged victim in this case."

During the State's closing, the prosecutor emphasized how Dalene abused her position of trust through unfair advantage and undue influence. The jury found Dalene guilty of mistreatment of a dependent adult and conspiracy to commit mistreatment of a dependent adult. At sentencing, the district court denied Dalene's motion for a dispositional departure and sentenced her to consecutive sentences of 59 months' imprisonment for mistreatment and 32 months' imprisonment for conspiracy. Dalene timely appeals.

ANALYSIS

*Was the evidence sufficient?*

### *Standard of Review*

When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014). In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or the credibility of witnesses. *Williams*, 299 Kan. at 525. It is only in rare cases where the testimony is so incredible that no reasonable fact finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

A verdict may be supported by circumstantial evidence, if such evidence provides a basis from which the factfinder may reasonably infer the existence of the fact in issue. However, the evidence need not exclude every other reasonable conclusion or inference. *State v. Brooks*, 298 Kan. 672, 689, 317 P.3d 54 (2014). A conviction of even the gravest offense can be based entirely on circumstantial evidence. *Brooks*, 298 Kan. at 689; but see *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009) (circumstances utilized to infer guilt must be proved and cannot be inferred or presumed from other circumstances).

*Does the evidence reflect Dalene's mistreatment of a dependent adult?*

The jury found Dalene guilty of mistreatment of a dependent adult and that Dalene took advantage of more than $250,000 of Viola's resources pursuant to K.S.A. 2013 Supp. 21-5417(a)(2) which reads:

> "(a) Mistreatment . . . of a dependent adult is knowingly committing one or more of the following acts:
>
> . . . .
>
> (2) taking unfair . . . . advantage of a dependent adult's physical or financial resources for another individual's personal or financial advantage by the use of undue influence, coercion, harassment, duress, deception, false representation or false pretense."

On appeal, Dalene argues there is insufficient evidence to show she knowingly took unfair advantage of Viola's assets by the use of undue influence.

There is sufficient evidence Dalene acted knowingly. Dalene essentially asks this court to reweigh the evidence and accept her testimony that she did not realize she was doing anything wrong as true. However, appellate courts generally do not reweigh evidence. *Williams*, 299 Kan. at 525. Dalene admitted she knew the Trust assets were to be used for Viola's benefit. After their house was foreclosed on, Dalene and Rick convinced Viola to sell the Trust land and used the proceeds to purchase a new house, albeit in the Trust's name, for her and Rick to live in. While living in the house, she had some intent to pay rent but only paid rent once ($600 for a $255,000 house). She also admitted to using Trust funds to purchase alcohol and cigarettes for herself and the expenses of eating out at restaurants for her and Rick. She purchased Rick a new truck that was titled in Rick's name and not the Trust. There was sufficient evidence for a rational factfinder to conclude Dalene acted knowingly.

Dalene also contends she did not take unfair advantage of Viola's assets by the use of undue influence, apparently because she did not pressure Viola to turn over her assets.

8

However, Dr. Benson testified Viola's cognitive evaluation led him to conclude that she was incapable of understanding, managing, or making independent decisions about her finances or property and could not protect her interests because she was susceptible to leading by others.

Dalene also admitted she knew of Viola's cognitive decline in 2010. She admitted Viola trusted her, saying: "Everything was joined together to benefit the farm, the family, and help take care of her and she always agreed that whatever you guys need, you know, to do what you think's right. She trusted us that way."

The State presented evidence of Viola's reluctance to sell the land while Hollembeak was her trustee. Dalene acknowledged Viola was "pretty strict" about not wanting to sell the land. The sale occurred in July 2011, after Viola's cognitive decline and after Rick and Dalene discussed selling the property with Viola on multiple occasions.

Viewed in the light most favorable to the State, a rational factfinder could conclude Dalene committed mistreatment of a dependent adult. There is sufficient evidence supporting the jury's verdict.

### *Did Dalene and Rick conspire?*

The jury also found Dalene guilty of conspiracy to commit mistreatment of a dependent adult. On appeal, Dalene argues: "If this Court finds the State failed to meet its burden for the charge of mistreatment of a dependent adult, it must similarly find the State failed to present sufficient evidence to support a conspiracy charge of the same crime." This is simply incorrect. Generally, conspiracy to commit a crime "is an offense separate and distinct from the crime that is the object of the conspiracy." *State v. Matson*, 14 Kan. App. 2d 632, 635, 798 P.2d 488 (1990), *rev. denied* 249 Kan. 777 (1991). Even

if there was insufficient evidence supporting Dalene's conviction for mistreatment of a dependent adult, the State could have presented sufficient evidence she conspired to commit mistreatment of a dependent adult.

Dalene further contends that, since conspiracy requires a specific intent to commit the underlying offense, there was insufficient evidence supporting conspiracy. "Specific intent is a question of fact for the jury which may be established by acts, circumstances, and inferences and need not be shown by direct proof." *State v. Mitchell*, 262 Kan. 434, 437, 939 P.2d 879 (1997). She argues she did not have the specific intent to commit mistreatment of a dependent adult because she believed everything she did was within her power as trustee. Dalene again asks this court to reweigh the evidence and accept her testimony as true. However, appellate courts generally do not reweigh evidence. *Williams*, 299 Kan. at 525.

Dalene admitted she agreed to sell Viola's land, and she agreed how the proceeds would be spent. When the land was sold, she signed the seller's statement as trustee. After the land was sold, Dalene made numerous purchases benefitting her and Rick. The proceeds from the sale were nearly exhausted within 2 months. A rational factfinder could infer Dalene intended to mistreat a dependent adult. When combined with Dalene's testimony that she agreed to sell the land and agreed how the proceeds would be spent with Rick's involvement, a rational factfinder could conclude Dalene conspired to commit mistreatment of a dependent adult. Viewed in the light most favorable to the prosecution, there was sufficient evidence Dalene conspired to commit mistreatment of a dependent adult.

*Was the jury instruction on condonation given in error?*

In its proposed jury instructions, the State requested a jury instruction based on PIK Crim. 4th 52.180. The district court ultimately determined the instruction was legally

appropriate and gave the jury an instruction informing them: "It is not a defense that the victim has excused the offense committed." On appeal, Dalene argues the district court erred when it gave the condonation jury instruction.

The standard of review when addressing challenges to jury instructions is based upon the following analysis:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

At the jury instruction conference, Dalene objected to the condonation instruction, thereby preserving the issue for appeal.

Dalene argues the instruction was not legally appropriate because she did not raise condonation as a defense. However, this does not tend to show the instruction was not legally appropriate; it suggests the instruction was not factually appropriate, that there were insufficient facts supporting the instruction. The instruction was legally appropriate because it was a proper statement of the law. Condonation is not a defense to a criminal prosecution. *State v. Puckett*, 240 Kan. 393, 396, 729 P.2d 458 (1986).

While the condonation instruction was legally appropriate, there were not sufficient facts supporting the instruction. Dalene never attempted to raise condonation as a defense. Instead, Dalene argued Viola consented to her actions. The State contends,

11

"the record is replete with references to Viola's approval of Dalene's actions." The State specifically argues "Viola's attendance at the closing was to approve, or condone, what had already transpired, namely the decision to sell Viola's land." However, none of the references to Viola's approval indicate her approval occurred after the actions were taken. In fact, Dalene testified she and Rick discussed the bigger purchases with Viola prior to making them and Viola would tell them to do what they needed to do. Viewed in the light most favorable to Dalene, the evidence indicates Viola may have consented to Dalene's actions before they occurred. Instead of condoning Dalene's actions after they occurred, Viola's consent is tempered by the fact she probably had no real understanding of what she was consenting to given the decline in her mental capacity. As such, there was insufficient evidence to support giving the condonation instruction, and the district court erred when it gave the instruction.

*The error was harmless.*

The district court's error was harmless. Since the State benefitted from the error, it has the burden to establish harmlessness. *Williams*, 295 Kan. at 516. In *Ward*, 292 Kan. at 569, the Kansas Supreme Court identified the test for harmless error:

> "The degree of certainty by which the court must be persuaded that the error did not affect the outcome will vary depending on whether the fundamental failure infringes upon a right guaranteed by the United States Constitution. If it does not, the trial court should apply K.S.A. [2015 Supp.] 60-261 and determine if there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record. If the fundamental failure does infringe upon a right guaranteed by the United States Constitution, the trial court should apply the constitutional harmless error analysis defined in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh. denied* 386 U.S. 987 (1967), in which case the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., proves there is no reasonable possibility that the error affected the verdict."

12

Dalene argues this court should apply the constitutional harmless error test because the State violated her constitutional right to present her theory of defense when it requested the instruction it apparently believed negated her consent defense. However, she was able to present a defense; accordingly, the constitutional harmless error test is inappropriate.

In light of the entire record, there is no reasonable possibility the district court's erroneous instruction affected the jury's verdict. Dalene admitted she knew the Trust's assets were to be used to benefit Viola. She admitted she used the Trust assets for herself and Rick. Further, both Nurse Burris and Dr. Benson testified Viola lacked the mental capacity to consent to Dalene's actions. We are firmly convinced the erroneous condonation instruction did not affect the trial's outcome.

*Prosecutor's Misconduct*

Dalene contends the prosecutor violated her constitutional right to a fair trial by misstating the law during closing arguments. In contrast, the State argues the prosecutor did not misstate the law but merely restated the facts.

*Standard of Review*

We recognize the well-reasoned rule, a claim of prosecutorial misconduct based on comments made during closing argument will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Roeder*, 300 Kan. 901, 932, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. First, the court determines whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. If the comments were improper and constituted misconduct, the appellate court

13

must determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. 300 Kan. at 932-33.

During closing argument, the prosecutor told the jury:

"Let's talk about mistreatment. To establish that Dalene Miller knowingly took unfair advantage of Viola Miller's physical or financial resources for Dalene Miller's personal or financial advantage by the use of undue influence. Long sentence, but we can easily break it down. What is unfair advantage? Dalene stood in a position of trust and confidence to Viola. She stood responsible to make sure Viola's needs were met. She took on that responsibility willingly. She literally signed up for it. Instead of acting for Viola's benefit, she admitted to not paying Viola's bill, and instead, used Viola's money and assets for herself. Unfair because Viola didn't have underwear. Unfair because Viola couldn't go to the doctor due to the defendant not paying the bill. Unfair because Viola didn't have enough clothes. Unfair because Viola's teeth were falling out because the defendant didn't take her to the dentist. Unfair because this was not a relationship of equals. Viola was vulnerable. She had declined so much that by the end of 2010, she was getting lost at Presbyterian Manor, the place she'd been living for the last seven years. Unfair because what the defendant did spend money on clearly provided no benefit to Viola. A house that Viola never lived in nor ever would. Food Viola never ate, nor even could. A truck she couldn't drive, an investment never used to pay for her care. Unfair because the defendant, a nurse whose duty is to look out for others, [preyed] on Viola's weaknesses."

We pause to note that neither defense counsel nor the district court objected during the prosecutor's closing argument, which to us indicates no one thought at the time the statements were made that they were so improper as to warrant an objection.

Citing *State v. Ahart*, No. 108,086, 2013 WL 5303521 (Kan. App. 2013) (unpublished opinion), *rev. denied* 299 Kan. 1270 (2014), Dalene argues the prosecutor misstated the law regarding "unfair advantage" and "undue influence." A misstatement of controlling law must be reviewed on appeal, regardless of a timely objection at trial, to

14

protect a defendant's right to due process. When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006); see *State v. Magallanez*, 290 Kan. 906, 915, 235 P.3d 460 (2010) (misrepresentation of burden of proof in closing argument).

Dalene argues K.S.A. 2015 Supp. 60-5417 defines "unfair advantage" and the prosecutor told the jury if it believed the circumstances were unfair then the element was met. Dalene's argument fails. First, though the statute provides examples of what constitutes "unfair advantage," K.S.A. 2015 Supp. 60-5417 does not define the term. When addressing whether the term was unconstitutionally vague, the court in *Ahart* indicated "the mere fact that the terms 'unfair advantage' and 'undue influence' are not defined in the statute does not mean that a person of common intelligence cannot understand which conduct is prohibited." *Ahart*, 2013 WL 5303521, at *4. Second, here, the prosecutor's closing argument did not define "unfair advantage"; the prosecutor did not misstate the law regarding unfair advantage; and the prosecutor's comments were not outside the wide latitude given prosecutors when discussing the evidence.

Dalene also contends the prosecutor misstated the law regarding undue influence when the prosecutor stated:

> "Whether there's been undue influence is whether Viola acted voluntarily, using her own reason and judgment. Sadly, it's clear that Viola could not use her own reason and judgment any longer.
>
> . . . .
>
> ". . . Dalene was in a position of trust. Viola trusted her. Viola needed Dalene to make decisions for her and it was Dalene's duty to make decisions for Viola's best interest. Not a foreign concept for a nurse whose duty was to other's best interests, but· even more than that, Dalene and Rick were family. They were Viola's kids. Viola looked to them for guidance.

15

. . . .

". . . In Viola's state, Dalene and Rick knew that all they had to do was say they needed something. They wanted something so they could be happy and Viola would give it. She'd never understand what she was doing."

Dalene contends the prosecutor misstated the law regarding undue influence when "(1) she stated Viola's mental condition made any conversation with Dalene constitute undue influence and (2) equated a breach of trust or breach of fiduciary duty as satisfying the element of 'undue influence.'" However, the prosecutor never stated Viola's mental condition meant any conversation with her constituted undue influence. Likewise, the prosecutor never said that a breach of trust or fiduciary duty was undue influence.

Finally, Dalene claims the prosecutor further diluted the definitions of unfair advantage and undue influence by telling the jury:

"The defendant wants you to believe that she just didn't understand what it meant to be a trustee. How hard is it to pay a bill that comes in the mail? That's all it is. The defendant admitted to the detective she knew the trust assets were supposed to be for Viola. And that she'd known it for years that it looked bad how they'd been abusing Viola's money. How hard is it to make sure someone has their basic needs met? When you boil this down to the most basic level, it comes down to the defendant choosing herself over — and Rick over Viola.

"Viola got eviction notices; Rick and Dalene got a new house with a pool. Viola couldn't drive; Rick got a new truck and a lot of gas. Viola didn't drink or smoke; Dalene got some peace of mind. Viola's teeth were falling out and she couldn't chew; Rick and Dalene were eating at 45 different restaurants. Viola needed help while Dalene helped herself. Helping each other out, I don't think so."

The State argues the statement, made in rebuttal, "simply highlighted the incredulity" of Dalene's theory of defense—that everything was done to make Viola happy and was done in her best interest.

16

"'[A] prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting argument made by defense counsel.' [Citation omitted]." *Roeder*, 300 Kan. at 932 (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct). In other words, defendants do not open the door to prosecutorial misconduct. *State v. Stimec*, 297 Kan. 126, 130, 298 P.3d 354 (2013).

The statement did not exceed the wide latitude given a prosecutor is given to discuss the evidence. In context, the prosecutor's statement did not dilute the definitions of unfair advantage or undue influence. Throughout her testimony, Dalene indicated she had no training to be a trustee, thought everything she was doing was allowed by the Trust, and was done for Viola's benefit. During closing, her counsel reminded the jury of this testimony. The prosecutor's statement did not dilute the legal standard; she was not telling the jury "it could decide the case on 'the most basic level' by looking at the differences between Dalene and Viola's individual circumstances." Instead, the statement highlighted the differences between Dalene's testimony and her actual conduct.

The prosecutor's comments were within the wide latitude given to prosecutors when discussing the evidence and did not deny Dalene a fair trial.

Affirmed.