NOT DESIGNATED FOR PUBLICATION

No. 116,868

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SYLVESTER PROVENCIO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed September 28, 2018. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Kerwin L. Spencer*, county attorney, *Mitch Spencer*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., BRUNS and GARDNER, JJ.

PER CURIAM: Sylvester Provencio appeals after a Sumner County jury found him guilty of battery, criminal deprivation of property, disorderly conduct, and reckless aggravated battery. On appeal, Provencio challenges certain evidentiary rulings made by the district court at his jury trial. He also contends that he is entitled to a new trial based on prosecutorial error. In addition, he contends that the district court erred in denying his motion for a new trial and related motion to recall the jurors. Finally, he claims he is entitled to reversal due to cumulative error. Finding no reversible error, we affirm Provencio's convictions.

FACTS

On the afternoon of April 21, 2015, Provencio drove his mother's Toyota pickup truck to pick up his friend, Austin Townsend, in Caldwell. The two then drove to pick up another friend, Nick Reedy. At some point, the three men—who were all in their 20s—went to visit Reedy's brother where they consumed alcohol. Later in the evening, the three men decided to go cruising in the Toyota pickup truck.

While driving around, Provencio turned off Highway 81 onto a muddy county road in Sumner County. Although Provencio attempted to turn the pickup truck around, he backed into a ditch and the truck became stuck in the mud. After the three young men unsuccessfully tried to push the truck out of the mud, Provencio called his mother to ask if his stepfather, Ed Baker, could come to help them.

Around 11:45 p.m., Greg Schneider and Bryan Nispel—who were both in their 50s—left a bar where they had been drinking and playing cards with friends. Nispel was driving his Dodge truck and was a little ahead of Schneider, who was driving his wife's pink Cadillac SUV. As Nispel was driving on Highway 81, he saw a pickup truck with some people standing by it off to the side of a county road. Nispel called Schneider on his cell phone, and the two men decided to see if the people needed help.

Schneider arrived at the scene first and saw two young men—Provencio and Reedy—arguing in front of a pickup truck that was stuck in the mud. Schneider indicated that he was there to help and that one of his friends was bringing a chain that they could use. Evidently, Provencio was upset and told Schneider that they did not need his help. As Provencio and Reedy continued to argue, Townsend apologized to Schneider. At that point, Schneider got out of the car he was driving and Nispel arrived at the scene a few minutes later.

2

When Nispel arrived at the scene, he noticed that Provencio was angry. Although it is unclear what prompted the incident, Provencio evidently ran toward Nispel yelling and swinging his arms as Townsend was talking to Schneider. It appears that Nispel hit Provencio in the nose and everyone except Townsend began fighting. As for Townsend, he ran away through the fields and made his way back to his home in Caldwell.

Reedy tackled Schneider and the two fought briefly. At one point, the fighting stopped and Schneider asked Nispel if he was okay. Nispel answered that he was but suggested that they needed to leave. Nispel was able to get into his truck, which was still running, and started to drive away. As he did, Nispel saw Reedy approach Schneider from behind and hit him on the head. Schneider was knocked to the ground by the blow and does not remember anything else until after Reedy and Provencio were gone.

Nispel turned his truck around and drove back to help Schneider. As he drove back toward the group, Nispel saw Provencio and Reedy stomping, kicking, and hitting Schneider as he laid on the ground unresponsive. When Nispel stopped, Provencio and Reedy began coming towards his truck. According to Nispel, he let off the brake and bumped them with the front of his pickup, and they fell into the ditch. He then called 911 from his truck. As he was heading back to where Schneider was laying, Nispel saw Provencio and Reedy driving off in the pink Cadillac.

When Nispel went to help Schneider, he was not responsive. According to Nispel, Schneider was "barely breathing, huffing blood and stuff out of his mouth, and blood running everywhere, and his side of his face was out about three and a half inches. It looked horrible." As Nispel was talking to the 911 dispatcher and helping Schneider, Provencio's mother and stepfather arrived at the scene. The stepfather helped Nispel get Schneider into his truck. Nispel then drove Schneider to the emergency room in Caldwell where he was treated for his injuries and was admitted to the hospital for three days.

Later that night, a Caldwell police officer located the pink Cadillac SUV belonging to Schneider's wife in the front yard of a house that was about a block away from the residence of Reedy's father. Around the same time, the police also received a 911 call from someone at the residence of Reedy's father. The officer who located the SUV went to speak to Reedy's father, who told him that his son and Provencio had been run over by a vehicle and been beaten up. Both Provencio and Reedy were there at the time and the officer took pictures of their injuries.

On April 28, 2015, the State charged Provencio with one count each of battery, disorderly conduct, aggravated battery, criminal deprivation of a motor vehicle, theft, burglary of a vehicle, and aggravated robbery. The State dismissed the aggravated robbery count at the preliminary hearing, and the district court ultimately granted a motion for acquittal on the theft and burglary counts at trial. We note that Reedy was also charged with similar charges arising out of the incident.

The district court subsequently consolidated their cases for trial. However, shortly before the trial was set to begin, Reedy pled no contest to aggravated battery and to an unspecified misdemeanor. Accordingly, Provencio was the only remaining defendant at the six-day jury trial held in May 2016. Austin Townsend was the first witness for the State. He testified about the events that occurred on April 21, 2015, and in the early morning hours of April 22, 2015. Townsend testified that Provencio and Reedy were frustrated when they could not get the pickup truck out of the mud. According to Townsend, Reedy pushed Provencio and the two exchanged words. The two began to calm down around the time that Provencio called his mother to have his stepfather come to help pull the truck out of the mud.

Townsend testified that it was dark by the time Schneider drove up to ask if they needed help. Provencio told Schneider that they had the situation under control and that he should leave. Townsend testified that he thanked Schneider for stopping and tried to

4

calm Provencio down. After Nispel arrived, Townsend heard either Nispel or Schneider call someone to ask if the person had a towrope. In Townsend's opinion, Schneider and Nispel were simply trying to help the young men. Although he did not see the incident in question, Townsend believes that he saw the pink Cadillac drive away as he was running home. When he got home, Townsend changed clothes and told his father about what had happened. He also gave a statement to the police that night.

The next witness to testify was Marci Bristor, the assistant director of Sumner County 911. Bristor testified that a 911 call was received from Nispel on April 22, 2015, at 12:16 a.m. The district court admitted a recording of the 911 call over the objection of defense counsel and allowed the State to play the 9-minute-and-45–second-long recording for the jury.

The physician who treated Schneider's injuries on April 22, 2015, Dr. James Blunk, testified next. Dr. Blunk gave an overview of the injuries Schneider sustained during the incident. In particular, Dr. Blunk testified that Schneider suffered multiple lacerations, perforated eardrum, two fractured ribs, a concussion, and a closed brain injury. He testified that Schneider stayed in the hospital for three days.

The State then called Nispel, who testified about the events that occurred. He testified that he went to a bar at around 9 p.m., where he drank three beers. Shortly after 11:45 p.m., Nispel left the bar. Schneider had also been at the bar and the two left at the same time in separate vehicles. As Nispel drove on Highway 81, he noticed a white vehicle with some people standing by it off to the side of one of the roads intersecting the highway. He called Schneider—who was behind him—to ask him if he thought the people were stuck or were just parked there. Schneider told Nispel that he thought they were stuck and the two older man decided to stop to help.

5

Because he did not have a chain in his pickup truck, Nispel called another person to see if he had a chain. Nispel testified that by the time he was able to turn around and arrive at the place where the pickup truck was stuck, Schneider was already there talking to the three young men. Because Provencio appeared to be agitated, Nispel asked him to "settle down" and told him that they were there to help pull his pickup truck out of the mud. According to Nispel, Provencio got upset and started screaming and cussing. Provencio then ran towards him and they briefly fought.

Nispel indicated that he was able to hit Provencio at least once, making his nose bleed. However, Nispel testified that, as a 55 year old, he quickly got tired fighting with the 21-year-old Provencio. According to Nispel, Provencio bit his arm and spit blood at him during the fight. At one point, Nispel was able to yank one of the shirts Provencio was wearing off him and they ended up in the ditch. Nispel was able to get out of the ditch but Provencio came after him again. Nispel testified that he then grabbed Provencio's other shirt and pulled it up around his head. This gave him time to run to his pickup truck and holler to Schneider that they should go.

At that point, Nispel started to drive away in his truck. As he was leaving, he saw Reedy approach Schneider from behind and hit him hard on the head. Nispel turned his pickup around and drove back toward the other men. As he did so, Nispel saw both Provencio and Reedy stomping, kicking, and hitting Schneider, as he lay unresponsive on the ground.

Nispel testified that as he was stopping, Provencio and Reedy started to come toward his truck. So, he "let off the brake and . . . ran into them with the front of the pickup and shoved them off into the ditch." Around the same time, Nispel called 911 using the Bluetooth speaker in his truck. When he turned around again, Nispel saw the pink Cadillac SUV driving away while Schneider was still lying on the ground. Shortly

thereafter, Provencio's mother and stepfather arrived and helped Schneider get into Nispel's pickup truck. After they did so, Nispel drove Schneider to the hospital.

Caldwell Police Officer Marshall Matthews also testified at trial. While on duty earlier in the evening, Officer Matthews had seen Provencio driving a pickup truck. At about 12:30 a.m., after he was off duty, Officer Matthews received a call to report back on duty to locate a pink Cadillac SUV or a red pickup truck. At 12:42 a.m., the officer saw the Nispel's truck and followed it to the hospital. He identified the two people in the truck as Nispel and Schneider. He also took photographs of their injuries and they were admitted into evidence at trial.

Officer Matthews spoke to Nispel at the hospital. Nispel told him that he and Schneider had stopped to offer the young men help but had been attacked by Provencio and another person. He also told the officer that the two young men had stolen Schneider's vehicle. Officer Matthews then began to search for Provencio. Although he did not find him, the officer was able to find the pink Cadillac SUV in the yard of a house in Caldwell. There was no one inside when the vehicle was located but the engine was still running and the driver's side door was open.

The dispatcher informed Officer Matthews that two people had reported to the police that they had been run over by a vehicle and that it could be related to the same incident that he was investigating. Although the caller did not identify himself, the 911 call came from Galen Reedy's residence—which was a block away from where the pink Cadillac SUV was located. Officer Matthews went to the Reedy residence and spoke to Galen Reedy in his front yard. Specifically, the officer testified, "He told me that his son and Mr. Provencio had been run over and beaten out in the country. And I advised him at that time that his son and Mr. Provencio were suspects in the same incident that he was describing." He went inside and located Provencio and Reedy. According to Officer Matthews, they both had injuries.

Sumner County Sheriff's Deputy Jeff Hawkins testified regarding his role in the investigation. He examined Nispel's truck and took blood samples. Deputy Hawkins also interviewed Townsend and went to the scene of the incident to take photographs. While taking photographs of the ruts in the ditch, he found two shirts. The photographs were admitted into evidence. Deputy Hawkins testified that he asked Schneider if he had given anyone permission to take his car the night of this incident and he said he had not.

Corey Ward testified that he was at a bar on the night of April 21, 2015, with Schneider, Nispel, and some other people. Shortly after Nispel and Schneider left, Ward overheard Ryan Sturm receiving a phone call from Nispel asking if he had a chain or something to pull a vehicle out of a ditch. The conversation ended abruptly, which Ward thought was strange. In addition, Strum testified about receiving the call from Nispel asking if he had a chain to pull a vehicle out of a ditch. Strum testified that he could hear someone yelling and saying Schneider's name before the phone call ended.

Schneider testified that he had four or five beers at a bar over the course of the evening. He testified that when he stopped to help the young men who were stuck in the mud, he saw that two of them were arguing. He further testified that Provencio and Reedy turned their anger towards Nispel and him. At one point when the fighting stopped, Schneider went and put his muddy coat in the back of his wife's Cadillac SUV. He asked Nispel if he was okay, and he answered that he was but that they needed to get out of the situation. According to Schneider, he saw Nispel come up out of the ditch and head toward his pickup truck. At that point, Schneider started walking back toward his vehicle and that is the last thing he could recall until Nispel asked him if he could get up after the young men had left. Schneider also testified about the nature and extent of his injuries.

According to Schneider, Provencio threw the first punch at Nispel. Moreover, he testified that he did not give Provencio or Reedy permission to take his wife's pink

8

Cadillac SUV that night. He testified that his checkbook was in the console of the SUV, and he did not give anyone permission to take it. Eventually, someone found his checkbook. However, according to Schneider, several of his credit cards were missing and were never recovered.

The next witness to testify was Sumner County Sherriff's Sergeant Lee Patterson. He was initially dispatched to the location of a 911 hang-up call at 12:17 a.m. but did not find anyone there. He then went to the Caldwell hospital and spoke with Nispel, who told him his version of the events leading to Schneider's injuries. Although Sergeant Patterson attempted to talk to Schneider, he was unable to do so because health care providers were working on him. However, he was able to take photographs of Schneider's injuries, which were admitted into evidence.

According to Sergeant Patterson, around 1:20 a.m. he went to the house were Reedy and Provencio were found. Sergeant Jessie Cornwell and Sergeant Patterson separated them to ask about the events that night. Although EMS was called, Provencio refused treatment when the paramedics arrived. Sergeant Patterson testified that he smelled alcohol on Provencio's breath when speaking with him. In looking through the Cadillac SUV, Sergeant Patterson noted that the inside of it was muddy.

Next, Sergeant Patterson went to speak to Townsend, who told him that he went "country cruising" with Reedy and Provencio that night. After the pickup truck they were riding in got stuck in the mud, Schneider and Nispel stopped to help them. Townsend told Sergeant Patterson about the fight but stated that he did not "know who threw the first punch or how the argument started." Once the fight started, Townsend left and ran back to his house in Caldwell. After talking to Townsend, Sergeant Patterson went back to the hospital to check on Schneider. He then went to Reedy's and Provencio's houses to arrest them.

9

After several other witnesses testified, the State rested. At that point, Provencio's attorney moved for a judgment of acquittal on the charge of aggravated battery. He argued that the evidence showed that Reedy—not Provencio—was the person who severally injured Schneider. In denying the motion, the district court noted that Nispel had testified that he saw both Provencio and Reedy attacking Schneider as he laid defenseless on the ground. Accordingly, it was left to the jury to decide whether the State had proven beyond a reasonable doubt that Provencio had committed aggravated battery.

Provencio waived his right to testify in his own defense. However, his attorney recalled Sumner County Sheriff's Lieutenant Keith Bristor—who testified during the State's case about Schneider's wallet and checkbook—to testify regarding blood samples allegedly taken from Nispel's truck. Specifically, Lieutenant Bristor testified that he was aware of no custody receipts for the blood allegedly collected.

On May 24, 2016, the jury returned a verdict finding Provencio guilty of battery, criminal deprivation of property, disorderly conduct, and the lesser included offense of reckless aggravated battery. Provencio subsequently filed a motion for judgment of acquittal as well as a motion for a new trial. The district court held a hearing on the motions on June 23, 2016. After hearing the arguments of counsel, the district court denied Provencio's motion for judgment of acquittal. Regarding the motion for a new trial, Provencio argued for the first time at the hearing that he should be allowed to call the jurors from the case to testify in support of his motion. The district court granted Provencio leave to set forth his specific reasons for requesting to recall the jurors within 10 days and granted the State 1 week to respond to Provencio's allegations.

On July 14, 2016, Provencio filed a motion for leave to recall unspecified jurors as witnesses. Provencio alleged that the victims and/or unspecified family members of the victims had approached unspecified jurors. Evidently, this issue had been presented to the district court during trial and had been addressed in chambers. Provencio did not provide

10

any affidavits from jurors or other specific information supporting his allegation of misconduct.

On August 4, 2016, the district court held the second hearing on Provencio's motion for a new trial and for leave to call jurors as witnesses. After hearing the arguments of counsel, the district court denied the motion. In doing so, the district court found that Provencio had not shown good cause for calling jurors as witnesses. Finally, on August 25, 2016, the district court sentenced Provencio to a controlling sentence of 31 months in prison.

ANALYSIS

*Evidence of Reedy's No Contest Plea*

On appeal, Provencio contends that the district court erred in not allowing him to present evidence at trial that Reedy had pled no contest to reckless aggravated battery. Specifically, Provencio wanted to present evidence to the jury of Reedy's plea and potentially the statement of facts given in support of the plea. The district court refused to admit this evidence at trial.

When reviewing the admissibility of evidence, we follow a two-step analysis. First, we must determine whether the evidence is relevant. Generally, all relevant evidence is admissible. *State v. Peppers*, 294 Kan. 377, 386, 276 P.3d 148 (2012); K.S.A. 60-407(f). "'Relevant evidence' is that having "any tendency in reason to prove any material fact." K.S.A. 60-401(b). Moreover, to be admissible, the evidence must be both material and probative. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016).

Evidence is material when the fact it supports is disputed and is significant under the substantive law of the case. *McCormick*, 305 Kan. at 47. We review the materiality of

11

evidence de novo. *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). Evidence is probative if it "'furnishes, establishes, or contributes toward proof.'" *McCormick*, 305 Kan. at 47. We review a ruling on the probative value of evidence for abuse of discretion. 305 Kan. at 47. Additionally, a district court may exclude otherwise relevant evidence if it determines that its probative value is outweighed by its potential for producing undue prejudice. K.S.A. 60-445; see *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013).

The district court abuses its discretion only if its decision

"(1) is arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, i.e., if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, i.e., if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

Provencio points out that the Kansas Supreme Court has found that "[w]hether a third party was responsible for the crime a defendant is charged with is clearly a material fact related to determining the defendant's guilt or innocence." *State v. Burnett*, 300 Kan. 419, 431, 329 P.3d 1169 (2014). Although we agree with this general principle, the district court in this case allowed Provencio to present evidence asserting that Reedy was the one responsible for injuring Schneider. Moreover, whether Reedy entered a no contest plea—which is not an admission of guilt—to the charge is not material or probative in this case because it does not support a disputed or significant fact. See *Beauclair v. State*, 308 Kan. 284, 296, 419 P.3d 1180 (2018) (stating that entering no contest pleas do not constitute legally binding admissions of guilt); *State v. Case*, 289 Kan. 457, 461, 213 P.3d 429 (2009) (stating that a no contest plea does not involve an express admission of guilt or of the material facts).

A review of the record in this case reveals that there was evidence introduced at trial upon which a reasonable jury could conclude that both Provencio and Reedy hit and kicked Schneider as he laid unresponsive on the ground. Moreover, there is evidence in the record upon which a reasonable jury could conclude that Schneider suffered multiple injuries as a result of being hit and kicked by the two young men. Schneider's injuries included two fractured ribs, multiple abrasions, blood in his urine, and problems with his left leg. Furthermore, Reedy's decision to enter a no contest plea to avoid trial and receive the benefit of a lesser conviction does not have any tendency to establish or disprove Provencio's guilt or innocence.

Provencio also suggests that the district court violated his constitutional right to present his theory of defense. The district court violates a criminal defendant's fundamental right to a fair trial if the court excluded relevant, admissible, and noncumulative evidence that is an integral part of the theory of the defense. However, the right to present a defense is subject to statutory rules and judicial interpretation of the rules of evidence and procedure. *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014).

Again, we note that the district court permitted Provencio to present evidence showing that Reedy was the person who attacked Schneider. In addition, Provencio was allowed to argue to the jury that he did not beat up Schneider. As stated above, the fact that Reedy pled no contest to reckless aggravated battery is not an admission that he committed the crime. Moreover, even if Reedy did in fact commit reckless aggravated battery, this does not tend to prove that Provencio did not also commit reckless aggravated battery. Thus, we conclude that the district court did not err in refusing to allow Provencio to introduce evidence of Reedy's no contest plea to the jury because the evidence was not relevant.

*Admission of 911 Recording*

Next, Provencio contends that the district court erred in admitting the recording of Nispel's 911 call without redaction. In particular, he argues that Nispel's description of the young men attacking Schneider as "drug heads" or "druggies" constituted inadmissible K.S.A. 60-455 evidence. In response, the State argues that the contemporaneous statements made by Nispel while perceiving the events do not constitute K.S.A. 60-455 evidence. Additionally, the State points out that Provencio did not request a limiting instruction. Lastly, the State argues that even if there was error, it was harmless.

At the beginning of the second day of trial, defense counsel objected to the State's plan to introduce the recording of Nispel's 911 call into evidence. Specifically, Provencio objected to a statement made by Nispel toward the beginning of the 9-minute-and-45-second-long 911 call in which he told the dispatcher that there were a "couple of drug heads out here trying to beat us up." The State responded that the 911 recording was admissible because it established the timing of events in the early morning hours of April 22, 2015. In addition, the State argued that it was offering the recording to demonstrate that Nispel was out of breath and excited as he reported the incident to the dispatcher.

Moreover, the State argued that "it would not be an easy redaction" because similar descriptive terms were used a couple of times early in the recording and again a couple of minutes later. The State also argued that Provencio had failed to assert his objection in a timely manner so that the recording could be redacted. The State further maintained that it was not going to question witnesses or otherwise emphasize Nispel's description of Provencio and Reedy.

The district court determined that Provencio had raised the issue out of time since defense counsel had access to the 911 recording for more than a year before trial. The

14

district court found that Provencio should have objected earlier in order to allow the State time to respond and to make redactions if necessary. Furthermore, the district court noted that Nispel was present to testify and could be cross-examined about anything he had said during the 911 call. Thus, the district court found the recording to be admissible and allowed it to be played to the jury.

K.S.A. 2017 Supp. 60-455(a) states that "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." Here, it is clear from the 911 recording that Nispel did not assert that Provencio committed a prior crime on a specific occasion. Instead, Nispel was giving a contemporaneous description of the events he was perceiving at the time he made the 911 call. See *State v. Butler*, 307 Kan. 831, 861, 416 P.3d 116 (2018) (stating that K.S.A. 60-455 does not apply if the evidence relates to crimes or civil wrongs committed as a part of the events surrounding the crimes for which the defendant was on trial). Accordingly, we conclude that the district court did not err in failing to grant Provencio's motion to exclude the evidence or to give a limiting instruction.

*Prosecutorial Error*

Provencio also contends that the prosecutor committed reversible error during closing arguments. We use a two-step process to review claims of prosecutorial error. *State v. Sherman*, 305 Kan. 88, Syl. ¶ 6, 378 P.3d 1060 (2016). First, we must decide if the statements or acts complained of fall outside the wide latitude prosecutors are afforded to conduct the State's case and to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If we find that the statements or acts fall outside the wide latitude given to prosecutors, we must then determine whether the error prejudiced the defendant's right to a fair trial. In the second step, the State must

demonstrate there is no reasonable possibility that the error contributed to the verdict. 305 Kan. at 109.

In describing the fight during closing arguments, the prosecutor stated that Townsend saw Nispel and Provencio fighting and "decided to take off as they were running—as they were running together. *That would be* [*Schneider*] *going over there to break up that fight. He probably was going to grab Provencio to stop the fight.* But Reedy grabbed him." (Emphasis added.) Later in his argument, the prosecutor stated: "*Schneider went over there to try to grab either* [*Nispel*] *or* [*Provencio*], but Reedy grabbed [Schneider], and they were wrestling . . . ." (Emphasis added.) According to Provencio, the prosecutor was either misstating the facts or commenting on facts not in evidence.

During closing arguments, "a prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence." *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011). Viewing the comments made by the prosecutor in this case in context, we find that he was attempting to draw reasonable inferences from the evidence presented to explain what Schneider was doing before he was hit in the head by Reedy. As such, we do not find the prosecutor's statements to fall outside the wide latitude provided to prosecutors during closing arguments.

Next, Provencio complains about a statement made by the prosecutor when referring to Nispel's 911 recording. After playing a portion of the recording to the jury, the prosecutor stated, "You'll recall that about five minutes into the tape, there's a conversation about getting [Schneider] in the pickup. It's about the time you can hear [Provencio's mother] going through a bunch of loud language there. And then you can hear Mr. Nispel saying, *'Your fucking kid did that—this.'* And then she—." (Emphasis added.) At this point, defense counsel objected and an off-the-record discussion was held. At the conclusion of the discussion, the district judge admonished the jury, stating:

16

"Members of the jury, you're to rely on . . . what you hear on the tape [and n]ot rely solely [on] what counsel says he heard."

It is extremely difficult to determine from the 911 recording what Nispel actually said to Provencio's mother. Hence, we find that the prosecutor's argument to be a reasonable inference based on the evidence presented during trial. Furthermore, we find that even if the prosecutor committed error, the district court appropriately admonished the jurors that they should rely on what they heard on the recording instead of what the attorneys claim to have heard. As our Supreme Court has held, the ameliorating effect of a jury admonition attempting to remedy a prosecutor's error must be considered in determining whether the erroneous conduct prejudiced the jury and denied the defendant a fair trial. *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015). Here, we find that the district court's admonishment to the jury about the 911 recording alleviated any potential prejudice to Provencio.

Provencio next contends that the prosecutor erred in stating that as Townsend was talking to Schneider, "[h]e heard a commotion and turned around and noticed blood on [Provencio's] face. [*Schneider*] *and Reedy ran that direction.* Then [Townsend] decided he didn't want to be involved in this, and he just took off." (Emphasis added.) In particular, Provencio argues that this was a misrepresentation of Townsend's testimony and left out the fact that Nispel was also running into the fight.

Again, we find this argument to fall within the wide latitude given to prosecutors during closing argument. We note that the prosecutor did not state that Nispel was not fighting. In fact, it is reasonable to infer from his argument that it was Nispel who hit Provencio in the nose. Moreover, the prosecutor did not say that Nispel did not run in the direction of the fight. He merely stated that Schneider and Reedy ran in that direction. Thus, we do not find that Provencio has shown this was a misstatement of the evidence by the prosecutor.

17

Provencio further maintains that the prosecutor committed error when he stated: "Nispel has to improvise to avoid incurring a two-on-one beating himself like what [Schneider] had endured. Nispel then, under the circumstances, *used reasonable force in self-defense* and knocks both of them off—off their feet as he continues past them to turn around and return." (Emphasis added.) Provencio argues that this argument was the equivalent of the prosecutor attempting to vouch for or bolster Nispel's credibility.

We recognize that "[a] prosecutor may not state his or her personal belief as to the reliability or credibility of testimony given at a criminal trial." *State v. Brinklow*, 288 Kan. 39, Syl. ¶ 6, 200 P.3d 1225 (2009). However, the wide latitude afforded to prosecutors in discussing the evidence during closing arguments "'includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle. It is not opening statement; it is not confined to a dry recitation of the evidence presented.' [Citation omitted.]" *State v. Kleypas*, 305 Kan. 224, 319-20, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017). Based on our review of the record, we find that this comment was consistent with Nispel's trial testimony as to why he bumped Provencio and Reedy with his pickup truck.

Even if we found prosecutorial error in this case, we do not find that Provencio was denied the right to a fair trial. We note that the district court appropriately instructed the jury that statements and remarks of counsel are not evidence. Moreover, the jury was instructed that if it found any of counsel's remarks were not supported by evidence, they were to be disregarded. Following the closing arguments, the district court again reminded the jurors that the arguments made by the attorneys were not evidence and that they were to base their decision on the evidence presented. Based on our review of the record, we conclude that there is no reasonable possibility that the prosecutorial errors alleged by Provencio contributed to the verdict.

*Allegations of Juror Misconduct*

Provencio suggests that the district court abused its discretion in denying his motion for a new trial in which he requested leave to recall unspecified jurors as witnesses. "The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." K.S.A. 2017 Supp. 22-3501. We review the trial court's decision on a motion for new trial for an abuse of discretion. *State v. Warren*, 302 Kan. 601, 614, 356 P.3d 396 (2015).

The Sixth Amendment right to a jury trial and the Fourteenth Amendment right to due process guarantee criminal defendants the right to a fair and impartial jury. Juror misconduct can impair this right and result in a fundamental failure in the trial. See *Morgan v. Illinois*, 504 U.S. 719, 727-28, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); *State v. Corey*, 304 Kan. 721, 732-34, 374 P.3d 654 (2016). Juror misconduct is generally described in situations involving "communications with jurors from outsiders, witnesses, bailiffs, or judges; and actions by jurors in the unauthorized viewing of premises, or reading of newspaper articles." *State v. Fenton*, 228 Kan. 658, 664, 620 P.2d 813 (1980). It can also apply in situations where a juror has deceived the court about his or her familiarity with other jurors, witnesses, the parties, or the facts of the case. See *State v. Jenkins*, 308 Kan. 545, 557-58, 422 P. 3d 72 (2018); *State v. Jenkins*, 269 Kan. 334, 337-39, 2 P.3d 769 (2000).

Kansas courts are prohibited under K.S.A. 60-441 from considering the mental processes of jurors when reviewing the validity of a verdict. However, under K.S.A. 60-444(a), a juror may be compelled to testify "as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441." A court's inquiry after recalling a jury is limited to extrinsic matters of physical facts, conditions, or

19

occurrences of juror misconduct. See *State v. Franklin*, 264 Kan. 496, 503-04, 958 P.2d 611 (1998).

Kansas Supreme Court Rule 181 (2018 Kan. S. Ct. R. 223) provides:

"A juror may be called to testify at a hearing on a posttrial motion only if the court—after a hearing to determine whether all or any jurors should be called—grants a motion to call the juror. If a juror is called, informal means should be used to obtain the juror's attendance at the hearing, rather than subpoena."

In *State v. Smith-Parker*, 301 Kan. 132, 166, 340 P.3d 485 (2014), the Kansas Supreme Court explained:

"'Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order. *Walters v. Hitchcock*, 237 Kan. 31, 36, 697 P.2d 847 (1985).' *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842 (1987)."

In the present case, we find that the district court did not abuse its discretion in determining that Provencio failed to meet his burden to show the necessity of recalling the jurors. The district court diligently considered two motions filed by Provencio on the issue and held two hearings on the issue. Despite being given two opportunities to do so, Provencio failed to come forward with a valid reason as to why the district court should take the extraordinary step of recalling jurors to testify.

Provencio argues on appeal that the district court never gave him permission to contact the jurors to obtain affidavits to file in support of his motion to recall the jurors. There is nothing in Kansas Supreme Court Rule 169 (2015 Kan. Ct. R. Annot. 263) in effect at the time Provencio filed his posttrial motions that would have prevented his attorney from asking a juror to voluntarily sign an affidavit. Moreover, if any jurors decide to talk to an attorney following a trial, they are free to "tell as much or as little as [they] like about [their] deliberations or the facts that influenced [their] decision." Rule 169. Even if Provencio thought he needed a court order to obtain permission to contact jurors to request affidavits to file in support of his motions, he never filed such a motion.

After the first hearing, Provencio simply filed a motion for leave to call jurors as witnesses in support of his motion for new trial. He did not support his request with any rationale that would justify the solemn step of requiring the jurors to return to the district court to testify. The district court found that it had previously dealt with an allegation regarding friends or family members of the victims interacting with jurors at the time the incident occurred. Likewise, Provencio has not shown that the district court erred in dealing with that issue. Thus, we conclude that the district court acted appropriately in denying the request to recall jurors, and we find no abuse of discretion in the denial of Provencio's motions for a new trial.

*Cumulative Error*

Finally, Provencio contends that he was denied a fair trial due to cumulative errors. When deciding if cumulative errors necessitate a new trial, the test is whether the totality of the circumstances establish that defendant was substantially prejudiced by cumulative errors and was denied a fair trial. We examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose. We also look at the nature and number of errors and their interrelationship, if any, as well as the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

21

We note that a single error cannot constitute cumulative error. *State v. Solis*, 305 Kan. 55, 71, 378 P.3d 532 (2016).

Based on our review of the record in this case, we do not find that Provencio has shown any errors. Moreover, even if we had found one or more errors, we do not find that Provencio was denied the right to a fair trial. We, therefore, affirm Provencio's convictions.

Affirmed.